**SPECIALTY EQUIPMENT & MACHINERY CORP. v. ZELL MOTOR CAR CO. et al.**

**Civ. A. No. 4801.**

United States District Court
D. Maryland.

Feb. 28, 1951.

Moore & Hall, Nelson Moore and William D. Hall, of Washington, D. C., and Barton, Wilmer, Bramble, Addison & Semans, Richard S. Wright, of Baltimore, Md., for plaintiff.

Davis, Lindsey, Hibben & Noyes, Harry W. Lindsey Jr., and George N. Hibben, of Chicago, Ill., and Niles, Barton, Yost & Dankmeyer, Carlyle Barton Jr., of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, Chief Judge.

This is a patent infringement suit brought by the plaintiff, Specialty Equipment and Machinery Corporation, a Maryland corporation, against the Packard Motor Company, a Michigan corporation, and its sales representative in Maryland, The Zell Motor Car Company, a Maryland cor-

poration. The suit is based upon alleged infringement by the defendants of reissue patent to G. Fleischel, Re. 23,326, issued January 9, 1951, covering a device for the control and operation of transmissions for automobiles. Defendants rely upon the usual defenses of noninfringement and invalidity.

The title of the Fleischel patent Re. No. 23,326 in suit is "Device for Control and Operation by Fluid Servo-motor". "More particularly", as stated in the specifications, "the purpose of the invention is to provide a control device for a fluid servo-motor which is arranged to change the gears in an automobile transmission, in which the distributor for the energizing fluid of the servo-motor is controlled in any suitable manner, with means operated by a force dependent on a modification of the operation of the transmission mechanism to control the distributor." As further stated in the specifications, the distributor for the servo-motor "puts the servo-motor into and out of action, for example by admission, by gradual regulation or by suppression of the energy accumulated in the driving fluid under the control of the selecting mechanism."

The patent calls for use of a standard type of clutch as, for example, the friction type, and the specifications state: "Regarding the clutch, it is proposed to render this control entirely automatic as much during the starting and stopping periods of the vehicle as during the changes of the speed combinations, the methods of operation of the clutch during these operations being, as is well-known, essentially different." The specifications continue to explain: "It is known, in effect, that during the starting the engagement of the clutch must be suitably and progressively controlled according to the running of the engine and of the vehicle, a too slow engagement causing racing of the engine and a too rapid or abrupt engagement the stalling of this latter. On the other hand, during the speed change the operation of the clutch must assure a more or less decisive engagement and be as rapid as possible. For an ordinary and non-operating friction clutch, the driver can adapt his control to the circumstances which arise. On the other hand, when the control is entirely automatic, for example, subordinated to the action of a centrifugal governor driven by the engine, it is necessary to provide special devices which, at any moment, are ready to come into action to assure a suitable engagement or disengagement of the clutch. Thus during the starting period it is necessary that below a certain speed of rotation $V^2$ of the engine the clutch is completely disengaged, that above the speed of rotation the engagement commences and increases when the speed of rotation of the engine increases, and that according to another speed of rotation $V^1$ of the engine, the engagement is complete.

\* \* \* \* \* \*

"Between the two speeds of rotation $V^2$ and $V^1$ the engagement which is null at $V^2$ increases with the speed of rotation of the engine in order to become complete at the speed of rotation $V^1$. This very progressive engagement, the limits $V^1$ and $V^2$ of which can be chosen at will with a view to the better result to be obtained and which intervenes for an operation already auto-regulating by itself, eliminates all jerks during starting, whatever may be the speed at which this latter takes place. \* \* \*

"It can easily be obtained with the device, such as described, that the mode of disengagement of the clutch at the time of slowing-down shall be different and shall take place at a speed of rotation other than that for the engagement at the time of starting. This permits the adopting of most advantageous values for each case."

Thus it will be seen that when summarized and translated into simple, non-technical language, Fleischel's object is to provide an automatic control for starting and stopping automobiles, as well as for their intermediate speeds, whereby there will be avoided jerks during starting and also racing and stalling of the motor, which are common occurrences with the ordinary clutch and gear type of automobile power transmission.

This patent which is a reissue granted January 9th of this year, of original pat-

ent to Gaston Fleischel, a Frenchman, No. 2,203,296, issued June 4, 1940, embraces 62 claims, but only 11 of them are in suit; namely, Nos. 6, 19, 23, 24, 25, 27, 28, 29, 30, 31 and 54. Furthermore, claims 23, 24 and 25 fall into one group or series, and claims 27 to 31, inclusive, fall into another group or series; that is, these claims, in their respective groups or series, represent variations in the same basic combination. Claims 6 and 27 are typical of the broader claims in suit. They read as follows: 6. "In the combination of an engine, a mechanism operatively connected thereto, and means including a servo-motor to operate said mechanism, means to supply fluid to said servo-motor, and control means for said fluid including a casing, a valve slidable in said casing, a source of fluid under pressure, an inlet opening from said source into said casing, outlet openings constituting a discharge, said openings being spaced along said casing in the direction of movement of said valve, said valve having obturating portions adapted to close the two end openings or to uncover said openings selectively and having a part of less cross section connecting said obturating portions opposite the intermediate opening, one of said end openings being the discharge opening, said obturating portions having different effective areas so that pressure fluid within the space between said obturating portions tends to exert on said valve a force which varies with variations in the operating conditions of the engine."

27. "In the combination of an engine, a mechanism operatively connected thereto, and means including a servo-motor to operate said mechanism, means to supply fluid to said servo-motor, and control means for said fluid including a distributor, said distributor being so constructed and arranged that the fluid controlled thereby exerts a force on the distributor, and means to exert on said distributor an opposing force which varies with variations in the operating conditions of the engine and normally increases when the charge to the engine increases from meagre to full charge, said engine being an internal combustion engine having means which jointly varies the charge to the engine and influences the means that exerts said opposing force."

It is admitted on behalf of plaintiff that the device of the Fleischel patent has never been put into commercial use. It is stated, however, and not refuted, that a workable device, constructed on the specifications and drawings of the patent, was made by the inventor. It is claimed that the intervention of World War II and the fact that the Alien Property Custodian held title to the patent for some seven years, have prevented its commercial development. Application for a patent for the device was first made by Fleischel in France in 1936, on which a patent was issued in 1940. The original American patent, on which the reissue patent in suit is based, was applied for in 1937 and, as already stated, it issued in 1940. Fleischel himself, although stated to be now in this country, did not testify.

In support of plaintiff's contention that the Packard so-called Ultramatic device is in all substantial respects the equivalent of Fleischel, the following similarities are claimed in the elements that go to make up the respective combinations: 1. Engine: In both Fleischel and Packard, the engine is an internal combustion engine having the usual throttle pedal for controlling the flow of gasoline thereto. 2. Clutch: In both Fleischel and Packard, the clutch comprises a pair of friction surfaces one of which is driven by the engine and the other of which is connected to the rear wheels. When the clutch is engaged these surfaces are brought together to transmit torque from the engine to the rear wheels. The clutch is engaged as the governor speed increases and is disengaged when the governor speed decreases. The throttle force varies the speeds at which engagement and disengagement occur. 3. Servo-Motor for Clutch: In both Fleischel and Packard the servo-motor controls the clutch in accordance with the pressure of the fluid applied to the servo-motor. 4. Fluid-Pump: In both Packard and Fleischel there is a fluid pump operated by some moving part of the vehicle for supplying fluid under pressure to the inlet of the distributor. 5.

Distributor: In both Fleischel and Packard the distributor has two pistons of different effective diameters. These pistons are connected together by a shaft of smaller cross-section than either piston. The casing has three openings. An inlet opening is fed with fluid under pressure from the fluid pump. An outlet opening is positioned between the pistons and is never covered by either piston. A discharge opening allows the fluid pressure to be relieved when uncovered. The valve has two extreme positions. In one of the positions the inlet opening is covered and the discharge opening is uncovered. In the other position the inlet opening is uncovered and the discharge opening is covered. The position of the valve controls the fluid flow to the servo-motor. 6. Governor: Both Fleischel and Packard have a governor that exerts a force on the valve in the same direction as the resultant of the force of the fluid between the pistons. This force increases as the governor speed increases. 7. Throttle Force: In both Fleischel and Packard, means are provided to exert a third force in opposition to the governor and fluid forces. This third force normally increases as the throttle pedal is depressed.

The experts who testified on behalf of Packard deny the existence of any of these similarities except as respects (1) engine, and (2) fluid pump. These Packard experts claim that there are at least six basic differences between Fleischel and Packard which completely negative the latter being treated as the equivalent of the former. All of these six differences are admitted to exist by the expert who testified for the plaintiff, but he denies that they are basic or material; that is, he claims that the differences are merely those of degree, and that the equivalent of each of them is found in the combination of Packard from both an automotive engineering standpoint and that of successful commercial operation. Obviously, before attempting to decide which position is correct, it is necessary to analyze these six differences between Fleischel and Packard, but again, before doing so, it is appropriate to state the doctrine of equivalents in the patent law applicable to combinations of the kind embraced in Fleischel and Packard.

The doctrine or rule by which the question of equivalents must be determined in the patent law is now firmly established by Supreme Court and other decisions, and may be thus defined: If two devices do the same work in substantially the same way and accomplish the same result, they are the equivalent of each other, even though they differ in form or shape. In other words, the test is whether the alleged equivalent combination consists not merely of a change of form but of the new employment of principles or forces or a new mode of operation. The result may even be the same. This will not prove that the two devices are equivalent. The patentee may bring the defendant within the letter of his claims, but if the defendant has departed so far from the principle of the patented device that the claims of the patent, literally construed in the light of its specifications, can not be shown to represent the defendant's actual device, there is no infringement. In other words, infringement involves substantial identity. It is not true that every combination which produces the same effect is necessarily an equivalent of any other combination used for the same purpose. If the alleged infringing device differs from that of the patent only in form, or in the re-arrangement of the same elements of the combination, there is infringement even if in certain particulars the second device be an improvement upon that of the patent. But even if the patent be a pioneer one, the alleged infringer must have done something more than reach the same result. He must have reached it by substantially the same or similar means. The function itself is not patentable, so if we say that a patentee of a new mechanism is entitled to every mechanical device which produces the same result, this would be to hold, in effect, that the patentee is entitled to patent his function. See Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 569, 18 S.Ct. 707, 42 L.Ed. 1136; Wheeling Stamping Company v. Standard Cap & Molding Co., 4 Cir., 155 F.2d 6, 8.

With this definition of the doctrine of equivalents before us, we now turn to a consideration of the six differences which the experts on both sides admit exist between Fleischel and Packard. They are as follows: 1. Fleischel has standard clutch and the usual mechanical gear arrangements for speed ratio. In contrast, Ultramatic has a torque converter in place of the standard clutch and employs no forward change speed gear arrangements for normal driving. 2. Fleischel's clutch must always be used to drive the car from the engine. It always must be used to start the car. There is no other driving connection between the engine and the car. In contrast Ultramatic starts and forward drives even up to 55 miles an hour entirely through the torque converter which multiplies the torque and eliminates the starting clutch. The direct drive clutch only comes into engagement from 15 to 55 miles an hour. The clutch cannot be used to start the car. 3. Fleischel's clutch is progressively engaged. In contrast Ultramatic clutch is operated quickly and not progressively. There are no intermediate positions. There is no wear. It is "all or nothing." 4. Fleischel's controls include a pressure regulating valve which is variably or very progressively operated over a wide range of rotation of the crank shaft from fully declutched to fully clutched condition. The governor tends to move the valve when the engine is started. This regulating valve in and of itself measures the pressure of the oil to the servo-motor for the clutch. In contrast in Ultramatic the direct drive valve is either entirely closed or entirely open and is moved directly from one end position to the other end position. It is "all or nothing". This control valve is not a regulating valve. It does not regulate the oil pressure that flows to the direct drive clutch. It is also in closed position when the car speed is below 13 m.p.h. 5. The small piston of Fleischel regulates the extent of the inlet opening to control the oil pressure to the clutch servo-motor and his large piston controls the discharge outlet, resulting in continuous regulation of pressure. Fleischel does not want the "all or nothing".

In contrast, in Ultramatic the ports are reversed and the large piston controls the inlet opening and the small piston controls the discharge opening, resulting in "all or nothing". There is no regulation. 6. In Fleischel the governor exerting the force on the distributor is driven from the engine and its operation is a function of the engine. If the governor were connected to the driven shaft the engine could not possibly start the car. In contrast, in Ultramatic the governor is driven by the output shaft, that is, it is driven at vehicle speed and not at engine speed. The engine can start the car and the governor does not come into effective operation until the speed of the car reaches at least 13 miles an hour. The governor pressure is opposed by the throttle pressure.

It is obvious from the mere statement of these differences that, apart from the question whether they are to be treated as basic, that is, so substantial as to defeat the claim of being equivalent as understood in the patent law, they unquestionably exist as the result of the employment by Packard of the torque converter, which is not employed by or even referred to in any part of the specifications or in any of the claims of Fleischel. However, this fact is not, in and of itself, sufficient to defeat equivalency, provided it can be shown that the Fleischel combination and its various parts could operate, without substantial change, with a torque converter; or, conversely, that the Packard combination with its various parts could be made to work successfully, without substantial change, if employed in Fleischel.

It is contended on behalf of Fleischel that the aforegoing interchange or substitution could be successfully applied without any material change in the construction of either Fleischel or Packard. Extensive detailed testimony has been introduced in support of this position, but we are satisfied that the weight of the credible evidence is to the contrary. In other words, in order to have the Fleischel combination operate with a torque converter such as Packard utilizes; or have the Packard combination operate successfully as constructed on Fleischel, numerous ex-

tensive, vital changes would have to be made in both construction and operation. While extended effort has been made through plaintiff's expert witness and by cross-examination of defendants' expert witnesses to prove this is not true, the Court does not believe that the plaintiff has been successful in this effort. The torque converter does away with gears. Its only purpose is not simply to get the car started, because the torque converter can be brought in at any speed from 15 up to 55 miles an hour. It is true that the only way Packard can start is by means of the torque converter. It is equally undisputed that the only way Fleischel can start is with the governor on the engine because, otherwise, the clutch would remain closed, since there would be an absence of means to start the valve which would operate the clutch.

The Court is satisfied that the testimony of defendants' experts outweighs that of plaintiff's expert and clearly shows that the differences, both in construction and operation, of the various elements in the two devices are not, as plaintiff contends, merely matters of degree, but are extensive, material, and in a number of respects vital changes. As McFarland, of the Research Division of the Packard Company, expert witness for the defendants, who has been working for a number of years on the Packard Ultramatic device, said, the six enumerated differences are definite ones in principle of operation. The basic principle of Fleischel is to regulate the fluid to obtain progressive action, whereas what Packard sought and obtained is to quickly apply the various operating units, and, therefore, when Packard elected to use the torque converter, the rest of the device had to be, and was "tailored" to suit the characteristics of the torque converter. For example, as witness McFarland explained, if the governor were put on the engine in the Packard device, when the governor was speeded up to about 600 r.p.m., the clutch would come in, which is exactly what is not desired. In other words, the clutch would be put in when it was desired to use the torque converter,

and not the clutch. The torque converter does not begin to work at 600 r.p.m.

Witness McFarland admitted that the Fleischel device is probably operable for the purpose that Fleischel claims he wants to use it; that much work has been done in recent years, and considerable advance accomplished, with various forms of clutches, but that in developing its Ultramatic device, Packard has taken a new departure, through its discovery that starting by fluid is the better way to accomplish the desired end; namely, smoother and easier driving at all required speeds. While it is true, the development of Packard's Ultramatic device was, generally speaking, contemporaneous with the appearance of Fleischel's patent, the weight of the more credible evidence is clearly to the effect that Packard made no attempt to copy or to utilize what Fleischel disclosed.

The neutral expert witness, Professor Shreeve, has not agreed with defendants' experts to the extent of saying that all of the differences which we have above referred to and analyzed, between Fleischel and Packard, and which plaintiff's and defendants' respective expert witnesses admitted exist, are in fact material differences in the sense that they require material change in construction and operation in order to accomplish the desired purpose. For example, the neutral expert witness has taken the position that it is not entirely accurate to contrast merely the direct drive valve in Packard with the Fleischel valve, he claiming that in order to have an accurate and complete comparison of this branch of the combinations, all three of the valves in Packard, that is, not merely Packard's direct drive valve but also its throttle valve and its modulating valve, should be compared with the Fleischel valve. The expert neutral witness, however, admits, as he obviously must, that if the Fleischel valve were substituted for all three valves in Packard, this would result in substituting a mechanical for a fluid means in the operation of Packard. We do not believe that there is anything in the testimony in this case which would reason-

910

ably support the contention that such substitution, from the point of view of patent law, would not be a material, substantial change from both a construction and operating standpoint. To the extent that Professor Shreeve considers the changes not of a material character that would be necessary to adapt the one device to the other so as to render the one or the other successfully operable, we cannot agree. At the same time, the neutral expert witness' testimony has been of material aid in clarifying the intricate mechanism of the two devices, and the precise questions at issue.

Plaintiff's position as to infringement, however, has a further and broader aspect than that embraced in what we have just said. Plaintiff contends that the claims in suit are so broad as to embrace Packard, apart from whether the patent drawings of Fleischel, or any of the exhibits or drawings introduced during the trial actually follow the Packard construction. However, we conclude that plaintiff has failed to support this contention with credible evidence. True, there are very broad claims. Whether Fleischel's patent is in fact, as claimed, a pioneer patent, is a question which we feel is more properly raised under the question of validity than of infringement, but we are satisfied it is only by reading into both the claims and the specifications, things that are not really there, and were never intended to be there, that plaintiff's position can be made tenable.

■ Having thus found that Packard does not infringe Fleischel, it becomes unnecessary to pass upon the validity of any of the claims of the Fleischel patent that are in suit because, as the Supreme Court has ruled, to hold a patent valid if it is not infringed is to decide a hypothetical case where the controversy is presented to the court on bill and answer and where, as here, the counter-claim is no more than the usual defense of invalidity because of alleged anticipation by prior art patents. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450; Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Aetna Life

Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617. It is true that in a decision later than those just cited, namely, Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, at page 330, 65 S.Ct. 1143, at page 1145, 89 L.Ed. 1644, the Supreme Court said: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. * * * It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz, 2 Cir., 133 F.2d 541, and the *District Court in this case followed what will usually be the better practice by inquiring fully into the validity* of this patent." (Emphasis supplied.) But we interpret this statement of the Supreme Court as not laying down a mandatory rule, and we know of no decision of the Supreme Court, or of the Court of Appeals of this or any other Circuit, which has ruled that validity *must* be decided in a case such as the present one. In a very recent decision by the Second Circuit Court of Appeals, Harries v. Air King Products Co., 183 F.2d 158, that court said at page 162, after referring to the passage from the Sinclair Company case which we have just quoted, that it "was certainly not put in the form of a preemptory direction, but rather of a cautionary admonition, to be followed when that is the more convenient course; and it is thus that Woodbury, J., construed it in Grant Paper Box Co. v. Russell Box Co., 1 Cir., 151 F.2d 886, 890. We are disposed so to understand it in the case at bar." Continuing, the Court said, 183 F.2d at pages 162–163: "If there be an issue more troublesome [than invalidity], or more apt for litigation than this, we are not aware of it. The defence for always deciding it first, is that, if the claim be invalid, it should not be allowed to stand as a 'scarecrow'; and that is quite true, granted the premise. Indeed, the same notion lies back of the disclaimer statute. But it must not be forgotten that the decision of a single court, whether district, or court of appeals, does not settle the

question. It is the usual, if not universal, custom of practitioners if the stake is enough, not to rest content with a single decision of invalidity, but to seek another forum, as indeed the disclaimer statute permits. A declaration of invalidity may therefore prove an ignis fatuus, as fictitious a security to those who wish to infringe the claim, as a declaration of validity may be a fictitious menace. We hold that it is open to a court to proceed as is most convenient, subject to the exception that, though the defendant has not infringed, claims may be so evidently invalid that the court should so declare."

A decree will be signed in accordance with this opinion, holding that the defendants do not infringe the Fleischel patent, and dismissing the complaint.