**SPECIALTY EQUIPMENT & MACHINERY CORP. v. ZELL MOTOR CAR CO. et al.**

**Civ. 4801.**

United States District Court
D. Maryland.
May 29, 1953.

Moore & Hall, Nelson Moore and William D. Hall, of Washington, D. C., and Barton, Wilmer, Bramble, Addison & Semans, Richard S. Wright, of Baltimore, Md., for plaintiff.

Davis, Lindsey, Hibben & Noyes, Harry W. Lindsey, Jr., and George N. Hibben, of Chicago, Ill., and Niles, Barton, Yost & Dankmeyer, Carlyle Barton Jr., of Baltimore, Md., for defendants.

COLEMAN, Chief Judge.

This is a patent infringement suit involving a device for the control and operation of power transmission for automobiles, embraced in a re-issue patent No. 23,326, of which the plaintiff, the Specialty Equipment & Machinery Corporation, incorporated in Maryland, is assignee, issued to a French citizen, G. Fleischel, on January 6, 1951.

The two defendants, the Packard Motor Car Company, a Michigan corporation, manufacturer of the alleged infringing device, the so-called Packard Ultramatic drive, and its sales representative in Maryland, the Zell Motor Car Company, a Maryland corporation, have asserted the usual defenses of (1) non-infringement and (2) invalidity of the plaintiff's patent. In addition, defendants attack the validity of the plaintiff's patent as a reissue patent on the grounds that: (a) its claims are drawn to an invention different from that covered by the original claims and therefore involve new matter; (b) defendants have acquired intervening rights, that is, rights which arose subsequent to the issuance of the original Fleischel patent but prior to the filing of the Fleischel application for the reissue, which bar plaintiff's right to any relief in the present case; (c) plaintiff has failed to prove, as required by R.S. Sec. 4916, 35 U.S.C.A. § 64 [1952 Revision, 35 U.S.C.A. §§ 251, 252], any inadvertence, accident or mistake involved in securing the original patent, such as to warrant issuance of the reissue patent; and (c) both the original and supplemental reissue oaths made by the patentee fail to make full disclosure to the Patent Office of the patentee's position.

There have been two hearings of this suit. As a result of the first hearing, the

Court rendered an opinion on February 28, 1951, holding that the Packard device did not infringe the Fleischel patent because of numerous vital differences both in construction and operation of various elements in the two devices. In view of this finding, the Court considered it unnecessary to, and therefore did not, examine and render a decision upon the validity of the Fleischel patent, since absence of infringement was found to be perfectly clear, even assuming the patent to be a pioneer one, that is, even giving to its entire specifications and the eleven claims in suit the *broadest* permissible interpretation. See this Court's extensive opinion in 96 F.Supp. 904. However, on appeal, the appellate court held that it was not prepared to say upon the record as presented, and without consideration of the prior art, whether the Packard device does or does not infringe the Fleischel patent; that consideration of the prior art is important not only on the question of validity but also on the question of infringement, since the range of equivalents, which goes to the scope to be accorded the claims, depends in large measure upon what is disclosed by the prior art. As a result, the appellate court remanded the case, stating that this was done "in order that the trial judge may consider the question of infringement in the light of the prior art and of the principles here laid down. While the prior art is being considered, the validity vel non of the patent as well as the question of infringement should be determined." See Specialty Equipment & Machinery Corporation v. Zell Motor Car Co., 4 Cir., 193 F.2d 515, 520.

In conformity with the mandate of the Court of Appeals, this Court held a hearing with respect to the validity of the Fleischel patent in all its aspects, and also reheard in all its aspects the question as to whether the patent was infringed by the so-called Packard Ultramatic device. While the entire testimony taken at the first trial was stipulated into the second trial, the question of infringement was heard de novo.

Because of the very intricate technical questions involved, this Court had initially recommended to counsel that they mutually agree upon a technical expert who should testify as a neutral inter partes witness in the case. This was done, and as stated in this Court's first opinion, 96 F.Supp. 904 at page 910, Charles Alfred Shreve, Jr., Professor of Mechanical Engineering, University of Maryland, who served as such a witness, was of material aid in clarifying the intricate mechanism of the two devices, and the precise questions at issue. As neutral expert witness for the second hearing, the parties selected, and the Court confirmed by appropriate order, Professor Francis H. Clauser, Chairman, Department of Aeronautics, School of Engineering, Johns Hopkins University.

### Synopsis of the Fleischel Patent and its Ten Claims in Suit.

The purpose and operation of the various elements embraced in combination in the Fleischel patent, as disclosed by the patent's specifications and its ten claims here in suit, are all analyzed in this Court's first opinion, 96 F.Supp. 904. However, in order that this second opinion may be entirely complete in itself, it is appropriate to repeat here a good deal of what was said in the earlier part of the first opinion.

Summarized in non-technical language, the basic purpose of the Fleischel patent as disclosed by the specifications and claims is to accomplish *automatically*, instead of by hand and foot control, two functions in the operation of an automobile, and to do this with greater smoothness as respects starting and stopping and all intermediate speeds than is possible by hand and foot: (1) moving the clutch in and out, and (2) shifting of gears.

The ten claims in suit have been classified by plaintiff into four groups as follows, the claims in each group representing merely variations in the same basic combination of elements common to every claim in the respective group: 1st group: claim 6. 2nd group: claim 19. 3rd group: claims 23, 24, 25 and the 4th group: claims 27 to 31, inclusive. Claims 6 and 27 are typical of the broader claims; the Court of Appeals so treated them, and they are particularly relied upon by the plaintiff. They read as

follows: 6. "In the combination of an engine, a mechanism operatively connected thereto, and means including a servo-motor to operate said mechanism, means to supply fluid to said servo-motor, and control means for said fluid including a casing, a valve slidable in said casing, a source of fluid under pressure, an inlet opening from said source into said casing, outlet openings constituting a discharge, said openings being spaced along said casing in the direction of movement of said valve, said valve having obturating portions adapted to close the two end openings or to uncover said openings selectively and having a part of less cross section connecting said obturating portions opposite the intermediate opening, one of said end openings being the discharge opening, said obturating portions having different effective areas so that pressure fluid within the space between said obturating portions tends to exert on said valve a force which varies with variations in the operating conditions of the engine."

27. "In the combination of an engine, a mechanism operatively connected thereto, and means including a servo-motor to operate said mechanism, means to supply fluid to said servo-motor, and control means for said fluid including a distributor, said distributor being so constructed and arranged that the fluid controlled thereby exerts a force on the distributor, and means to exert on said distributor an opposing force which varies with variations in the operating conditions of the engine and normally increases when the charge to the engine increases from meagre to full charge, said engine being an internal combustion engine having means which jointly varies the charge to the engine and influences the means that exerts said opposing force."

Turning to the various basic elements involved in combination in the Fleischel patent as described in the specifications and claims for use in a motor car having the usual internal combustion engine, with throttle pedal for control of the flow of gasoline to it, they may be summarized as follows: First, as to operation of the clutch: (1) A starting clutch, of standard friction surface type, for engaging the engine with the transmission, which as de-scribed in the specifications, is multiple four speed and reverse. (2) An oil pump supplying oil under pressure to (3) a distributor valve which has two pistons of different effective diameters, connected together by a shaft of smaller cross section than either piston. The valve casing has three openings: (A) inlet opening fed with oil under pressure from the oil pump; (B) outlet opening placed between the two pistons and never covered (closed) by either piston; and (C) discharge opening allowing the oil pressure to be relieved when the opening is uncovered. Thus, this valve has two extreme positions: in one the inlet opening is covered and the discharge opening is uncovered; whereas in the other, the inlet opening is uncovered and the discharge opening is covered, and the particular position controls the flow of oil to (4) a servo-motor, i. e., a piston and cylinder operated by the application of fluid pressure upon it. (5) A governor driven by the engine and therefore responsive to engine speed which exerts a force on the distributor valve in the same direction as the force of the oil resulting from the operation of the two pistons. A third force, i. e., that applied by the throttle pedal, is exerted in opposition to these two other forces, i. e., engine and servo-motor forces. As the driver depresses the accelerator pedal more and more, and thereby speeds up the engine, this causes the increased speed of the governor to move the distributor valve to the right, causing progressively greater engagement of the clutch, which becomes complete when engine speed has reached a point which causes the governor to move the distributor valve so far to the right as to stop operation of the servo-motor due to loss of pressure through oil venting, thereby causing the springs in the clutch to fully engage it, and the car is then moving in first or low gear.

Second, as to gear-shifting: Changing of speed through change of gears may be accomplished manually by use of a hand lever, under the steering wheel, or automatically as follows: the engine-driven governor is connected to an oil regulating valve so constructed that as the force of the engine-driven governor increases, the

pressure in the valve is sufficient to move it to the right through four successive notches, each one of which movements is correlated to a servo-motor to which is applied the oil pressure from the valve, and which thereby operates the corresponding speed gear mechanism. As the speed of the engine is decreased, the foregoing operations are reversed, the gears being shifted progressively to the lower ratios until the clutch is finally disengaged when the force exerted on the valve by the governor has been exceeded by the opposing force.

The title of the Fleischel patent Re. No. 23,326 in suit is "Device for Control and Operation by Fluid Servo-motor". "More particularly", as stated in the specifications with respect to gear-shifting, "the purpose of the invention is to provide a control device for a fluid servo-motor which is arranged to change the gears in an automobile transmission, in which the distributor for the energizing fluid of the servo-motor is controlled in any suitable manner, with means operated by a force dependent on a modification of the operation of the transmission mechanism to control the distributor." As further stated in the specifications, the distributor for the servo-motor "puts the servo-motor into and out of action, for example by admission, by gradual regulation or by suppression of the energy accumulated in the driving fluid under the control of the selecting mechanism."

The patent calls for use of a standard type of clutch as, for example, the friction type, and the specifications state with respect to clutch operation: "Regarding the clutch, it is proposed to render this control entirely automatic as much during the starting and stopping periods of the vehicle as during the changes of the speed combinations, the methods of operation of the clutch during these operations being, as is well-known, essentially different." The specifications continue to explain: "It is known, in effect, that during the starting, the engagement of the clutch must be suitably and progressively controlled according to the running of the engine and of the vehicle, a too slow engagement causing racing of the engine and a too rapid or abrupt engagement, the stalling of this latter. On the other hand, during the speed change the operation of the clutch must assure a more or less decisive engagement and be as rapid as possible. For an ordinary and non-operating friction clutch, the driver can adapt his control to the circumstances which arise. On the other hand, when the control is entirely automatic, for example, subordinated to the action of a centrifugal governor driven by the engine, it is necessary to provide special devices which, at any moment, are ready to come into action to assure a suitable engagement or disengagement of the clutch. Thus during the starting period it is necessary that below a certain speed of rotation $V^2$ of the engine the clutch is completely disengaged, that above the speed of rotation the engagement commences and increases when the speed of rotation of the engine increases, and that according to another speed of rotation $V^1$ of the engine, the engagement is complete. * * *. Between the two speeds of rotation $V^2$ and $V^1$ the engagement which is null at $V^2$ increases with the speed of rotation of the engine in order to become complete at the speed of rotation $V^1$. This very progressive engagement, the limits $V^1$ and $V^2$ of which can be chosen at will with a view to the better result to be obtained and which intervenes for an operation already autoregulating by itself, eliminates all jerks during starting, whatever may be the speed at which this latter takes place. * * *."

"It can easily be obtained with the device, such as described, that the mode of disengagement of the clutch at the time of slowing-down shall be different and shall take place at a speed of rotation other than that for the engagement at the time of starting. This permits the adopting of most advantageous values for each case."

The patent which is a reissue granted January 9th, 1951, of original patent to Gaston Fleischel, No. 2,203,296, issued June 4, 1940, embraces 62 claims, but only 10 of them are now in suit; namely, Nos. 6, 19, 23, 24, 25, 27, 28, 29, 30 and 31. Claim 54 had also been brought into the suit originally, but is now not relied upon.

## Question of Validity.
### Prior Patents.

In support of their charge of invalidity of the Fleischel patent, defendants rely upon seven prior patents which they claim, either individually or collectively, anticipate Fleischel. No prior public use, independently of these patents, is asserted by defendants.

These seven prior patents are the following, listed chronologically, with date of issue: To Kramer, No. 828,939, August 21, 1906; to Lockwood, No. 951,511, August 10, 1910; to Martyrer, No. 2,014,944, September 17, 1935; to Zelov, No. 2,101,-944, December 7, 1937; to Livermore, No. 2,103,540, December 28, 1937; to Maybach, No. 2,144,074, January 17, 1939; and to Roche, No. 2,261,128, November 4, 1941. We will consider each of these prior patents in chronological order, first as respects the character and extent of the disclosures in the respective specifications and claims of these patents; and second, by comparing analytically such disclosures with each of the ten Fleischel claims in suit.

First, then, as to the patent to Kramer. This is a patent for an air pressure brake for use on street cars and locomotives. It does not purport to be applicable to an internal combustion engine. Furthermore, while it teaches the use of an unbalanced valve in order to obtain stable control of servo-motors, the teaching is limited to a small part of the essential elements in Fleischel. For example, Kramer does not involve a clutch or a throttle-connected means for exerting a variable force on a fluid distributor. As a matter of fact, air and not liquid, is specifically called for in Kramer. Thus Kramer is in no sense a disclosure of Fleischel.

Next, as respects Lockwood, this patent discloses nothing new over Kramer that is material to the present case, and in fact, embraces even fewer of Fleischel's basic elements. It is a patent for a pressure controlling valve on steam pipes, etc. but particularly adapted for control of fluid-operated brakes for hoists. It does not relate to internal combustion engines. No clutch, no throttle, no governor is involved.

As respects Martyrer, this is a patent for a hydrodynamic (fluid-operated) gear, and does embrace a combination of elements somewhat akin to that of Fleischel. The stated object of this patent is to provide for motor vehicles and other types of motor-driven plants a manually operable gear-changing means, which are under the control of the operator and enable him to re-engage a torque converter at any time, while simultaneously releasing the clutch. However, Martyrer does not embrace a fluid distributor with differential areas, or a governor or a throttle for exerting force on the distributor. Thus, Kramer, Lockwood and Martyrer, whether considered collectively or individually, clearly do not anticipate any of the ten Fleischel claims in suit.

Next, as to the patent to Zelov. It is for "a prime mover governor system". It embraces a speed governor, particularly for "a prime mover" which is any engine completely self-contained in its ability to deliver power, but more specifically the patent applies to steam turbines. Its object is to provide a speed governor which transforms changes in the centrifugal force of governor fly-weights into corresponding oil pressure changes directly and substantially without governor travel, thereby increasing the rapidity of response to speed changes of the engine. Zelov involves no clutch mechanism, and while it does not specifically refer to *automobile* gear-shifting mechanism, the mechanism that it does disclose is substantially that of Fleischel. In other words, it is operatively connected to an engine; it is controlled by a servo-motor with a fluid supply; it has a fluid distributor with differential areas acted on by the unbalanced force of the controlled fluid; the distributor casing has three openings, the middle one being always open; the two end openings are closed and opened selectively; and there is a governor operated by the drive shaft of the engine for exerting force on the distributor. Thus, insofar as Fleischel's gear-shifting mechanism is concerned, Zelov discloses its basic elements but without applying the mechanism to automobiles.

Next, we pass to Livermore which relates to automatic speed change transmissions. Here we find a prior patent that bears a closer relation to Fleischel than does the Zelov patent, in that the Livermore device is specifically designed for automobiles and embodies both clutch and gear-shifting mechanism.

Livermore seeks to achieve the same primary result as Fleischel, but his approach is different because with Fleischel the governor is on the engine, whereas with Livermore it is on the rear wheels. Furthermore, with Fleischel, primary concern is attached to the operation of the clutch. This is why his governor is attached to the engine. Livermore, by having the governor on the rear wheels, makes his shifting function much simpler than that of Fleischel, but on the other hand, it makes Livermore's clutch problem more complicated than Fleischel's. Livermore teaches no progressive clutch action such as Fleischel's. His clutch action is not determined by speed control. With Livermore, the governor is not affected during starting of the car, but only during gear-shifting and, as demonstrated by Professor Clauser, the neutral expert witness, quick pressure upon the accelerator would apparently be bound to give a jerk to the car, in spite of what is said to the contrary in the Livermore specifications.

Next in chronological order is the patent to Maybach. This is described as an automatic clutch control device. It describes no gear-shifting mechanism. However, the clutch engaging mechanism is similar to that of Fleischel, i. e., there is automatic engagement and disengagement of the clutch. The clutch engaging force is controlled automatically by an auxiliary device depending upon engine speed. This is to say, as stated in the patent, "the movement of the slidable clutch member adjusts itself automatically, in each stage of the clutch-engaging operation, to the resistances to travel and to the regulation effected by the driver." In other words, the basic feature of Maybach is that the distributor fluid is impelled in one direction or the other by the use of pistons of different diameters between which the fluid enters in

such manner, depending upon engine speed, as to cause the servo-motor to engage or disengage the clutch. While Maybach does not embrace any gear-shifting mechanism but merely clutch mechanism, the Maybach principle is essentially the same as that employed by Fleischel for both mechanisms.

Lastly, as to Roche, this patent is designated as one for "transmission", and relates particularly to progressive transmission. It may best be described by quoting the following from the patent's specifications: "In automotive vehicles it is customary to employ between the engine and wheels thereof a transmission consisting of gears adapted to be combined in different ratios, so that by engaging different sets of gears the wheels of the vehicle may be operated at varied speeds relative to the speed of rotation of the engine, thereby making it possible to utilize the power of the engine, to the best advantage. In this customary form of transmission a clutch is employed which must be released when it is desired to change the driving ratio of the engine to the wheels of the vehicle. Also, in this common form of transmission it is necessary to disengage one set of gears when another set of gears is to be employed for driving purposes. My invention comprehends an improvement in gear transmissions of the character above discussed, wherein several driving ratios may be attained without the necessity of disengaging gears or of disengaging the standard clutch by which the transmission is connected to the engine of the vehicle."

The Roche specifications provide for the governor to be mounted on a shaft "connected to a desired rotating part of the vehicle, but preferably to the engine." While this transmission is very similar to that of Fleischel, it lacks a very important feature of Fleischel in that it makes no provision for clutch action with an unbalanced valve.

The aforegoing analysis of the seven prior patents, on which the defendants rely to sustain their contention that the ten claims of the Fleischel patent here in suit are void for anticipation, is sufficient without more,—that is to say, without proceeding with a detailed comparative

analysis of the different factors or elements embraced in these claims and those embraced in the disclosures of the seven alleged anticipating patents,—to justify one definite and important conclusion, i. e. that the Fleischel patent is not, in its particular field, and therefore, a fortiori, is not in any broader field, strictly a "pioneer" in the patent law meaning of that word, which is that a patent in order to be treated as a pioneer must embody an invention that is basic, primary in character. If it does, it is entitled to a more liberal interpretation with a broader range of equivalents than would otherwise be the case. In Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, at pages 561–562, 18 S.Ct. 707, 718, 42 L.Ed. 1136, the Supreme Court defined the word "pioneer" as used in our Patent law as follows: "This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are the one to Howe, of the sewing machine; to Morse, of the electrical telegraph; and to Bell, of the telephone. The record in this case would indicate that the same honorable appellation might be safely bestowed upon the original air brake of Westinghouse, and perhaps, also, upon his automatic brake. In view of the fact that the invention in this case was never put into successful operation, and was to a limited extent anticipated by the Boyden patent of 1883, it is perhaps an unwarrantable extension of the term to speak of it as a 'pioneer,' although the principle involved subsequently, and through improvements upon this invention, became one of great value to the public. The fact that this invention was first in the line of those which resulted in placing it within the power of an engineer, running a long train, to stop in about half the time and half the distance within which any similar train had stopped, is certainly deserving of recognition, and entitles the patent to a liberality of construction which would not be accorded to an ordinary improve-

ment upon prior devices. At the same time, as hereinafter observed, this liberality must be exercised in subordination to the general principle above stated,—that the function of a machine cannot be patented, and hence that the fact that the defendants' machine performs the same function is not conclusive that it is an infringement."

Enough has been said in the analysis already given to show that, at most, whatever pioneer status Fleischel may properly be accorded must be shared, if not with Zelov and Maybach, certainly with Livermore. His application date was March 12, 1934, whereas Fleischel's earliest application was in France on May 7, 1936, for a patent similar to his reissue patent here in suit. Furthermore, there is no really definite proof in the testimony that Fleischel's device had ever been constructed according to the patent specifications and put to a practical test. In other words, there is no clear proof of the satisfactory operability of Fleischel's mechanism. There is no evidence that Fleischel ever demonstrated his device, actually installed in an automobile, to any one in France, in this country or anywhere else. Commencing about 1928, what he called "the brain" of his invention was electrically operated. There are no drawings or other evidence that Fleischel conceived the device of his patent prior to its filing date in France in 1936. The earliest definite disclosure presented at the trial is contained in the April 29, 1938 edition of the publication called the "Commercial Motor". But even there the Fleischel controls are not described, only the gearshifting mechanism. Fleischel's own testimony in this respect, and indeed generally, because of his lack of any fluency in speaking English (although he has been a naturalized American citizen for a number of years) was very disjointed and unsatisfactory. He testified that he had unsuccessfully endeavored to interest automotive manufacturers in this country in his device. Fleischel's original patent issued in 1940. As a result of the War, since Fleischel was a French citizen in enemy-occupied territory, by Executive Order title to the patent became "frozen" and the patent was later seized by the Alien Property Custodian, but returned to him in December, 1947, and

thereafter by assignment, the present plaintiff acquired title to the patent, Fleischel retaining an interest in any recovery in the present suit. Making due allowance for the effect of World War II, we still are forced to the conclusion that satisfactory operability of Fleischel's device remains unproven in the present case. It is true that Professor Clauser, the neutral expert witness, expressed the opinion that Fleischel is entitled to pioneer ranking at least equal to that to be accorded to Livermore and Maybach, because of the *completeness* of his clutch action not found in Livermore or elsewhere in the prior art. However, Professor Clauser stated that he had very definite doubt as to whether Fleischel's gear-shifting mechanism would work as described in the patent,—that objectionable jerks would be inevitable during its operation.

As heretofore explained, Livermore and Fleischel had the same broad goal in mind, but with Livermore the smoothness of the gear-shifting operation was dominant. That is why he placed the governor on the rear wheels; whereas with Fleischel, smoothness of the clutch operation was dominant. As Professor Clauser, the neutral expert witness, stated, Livermore appears to have evolved a better, i. e., a smoother gear-shifting mechanism, but a less smooth clutch mechanism, than Fleischel. Professor Clauser went on to state that it was difficult for him to comprehend why, with the teaching of Livermore available Fleischel did not specify or indicate the desirability of placing a second governor on the rear wheels, a second governor being actually shown on one of the Fleischel drawings but not on the rear wheels.

However, even if there be given to the Fleischel patent a quasi or limited pioneer status with Livermore, it is still necessary to make a detailed analysis of the ten Fleischel claims in suit and to compare their basic elements with those which, as we have just seen, are embodied, in varying degree, in each one of four prior patents, namely, the patents to Zelov, Livermore, Maybach and Roche. The other three prior patents, i. e., those to Kramer, Lockwood and Martyrer, need not be further analyzed

since what each of them teaches is, as we have already explained, materially different from the mechanism involved in Fleischel. Suffice it to repeat that Kramer relates to an air-brake for street cars and locomotives. His mechanism does not purport to be applicable to internal combustion engines. Kramer embodies neither a clutch nor a throttle-connected means for exerting a variable force on a fluid distributor. Lockwood has no relation to internal combustion engines. He teaches a progressive controlling valve on steampipes which involves neither throttle nor governor. As respects Martyrer, while he does disclose a mechanism for use in automobiles, i. e., a manually operable gear-shifting means syncronized with the clutch, he does not disclose a fluid distributor with differential areas, or a governor or a throttle for exerting force on the distributor.

Turning, then, to a comparison of the teachings of the four patents to Zelov, Livermore, Maybach and Roche, with the ten Fleischel claims in suit, it is first necessary to have a clear picture of all of the specific material elements prescribed, in varying extent, in the mechanical combinations that constitute these ten claims. There is no material dispute between the parties themselves in the present suit, or between either side and the neutral expert, as to the number and character of these elements. They are fifteen in number, as follows: (1) an engine (in all but four of the claims—Nos. 6, 23, 24 and 25) specified as an internal combustion one. (2) A mechanism operatively connected to the engine. (3) A clutch. (4) A servo-motor to operate this mechanism. (5) Fluid supply for this servo-motor. (6) A fluid distributor with differential areas acted upon by unbalanced force of the controlled fluid. (7) A casing for this fluid distributor that has three ports or vents, with middle outlet always open. (8) Abrupt movement of the fluid distributor. (9) Obturating, i. e., closing portions of this distributor which selectively open and close its two end openings. (10) A throttle with connecting means for exerting a variable force on the fluid distributor. (11) This force is opposed to the force exerted by a governor. (12) The

throttle force, jointly varies the charge of the fluid to the distributor and influences this opposing force. (13) The governor is driven by some driven part of the automobile. (14) It is driven in the same direction as the controlled fluid force. (15) When speed of the automobile is decreased, the force exerted on the fluid distributor by the governor is reduced.

We find that each one of these various elements is sufficiently · described, as respects both construction and operation, in the Fleischel patent specifications to enable one skilled in the branch of automotive engineering art here involved to construct the mechanisms defined in each of the ten Fleischel claims. In other words, we find that these claims read on and are responsive to the specifications. The neutral expert witness testified to the same effect. However, he did not find, nor do we, as hereinafter explained, that the claims are responsive to the specifications of the patent to the extent that Fleischel contends.

Turning now, in chronological order, to the four alleged anticipating patents that remain to be considered and comparing their basic elements which we have heretofore analyzed with those of each of the ten claims of Fleischel in suit, first is the patent to Zelov. Fleischel claim No. 6, as already stated, is typical of his broader claims. This is one of four Fleischel claims (out of the ten here in suit) that do not specify an internal combustion engine, but merely an engine. All the basic elements of the gear-shifting mechanism of this 6th claim of Fleischel are disclosed in Zelov. Zelov does not specifically refer to an *automobile* gear-shifting mechanism, but he does disclose a governor system for a "prime mover", which is any engine completely self-contained in its ability to deliver power. Fleischel's claim 6 does not include a governor. Thus, Zelov teaches all that Fleischel's claim 6 teaches, and more. Neither teaches any clutch mechanism.

Turning next to the Livermore patent, we find that it discloses the same combination of all the elements of Fleischel claims Nos. 19, 27 and 28. It is to be noted that claim 27, just as claim 6, is typical of the broader claims of Fleischel. It embraces clutch mechanism which is non-existent in claim 6, and also in Zelov, but is embraced in Livermore. Claim 28 (a narrow claim) also has the clutch mechanism which is found in Livermore.

Next, with respect to Maybach, we find that it anticipates Fleischel's claims 6 and 23. While Maybach does not embrace gear-shifting mechanism, the Maybach principle, as heretofore pointed out, is essentially the same as that employed by Fleischel for both mechanisms. Thus, claim 6 of Fleischel is anticipated by Maybach as respects gear-shifting mechanism, and claim 23 of Fleischel is also anticipated by Maybach because it prescribed specifically the clutch mechanism embraced in the disclosure of Maybach.

Lastly, as to Roche, we find that this patent does not anticipate any of the ten Fleischel claims in suit primarily because it is devoid of that very important factor of Fleischel which is common to all ten Fleischel claims, namely, a fluid distributor with differential areas acted upon by unbalanced force of the controlled fluid.

■ To summarize the aforegoing comparative analysis, we find as follows: claim 6 is anticipated by Zelov and Maybach; claim 23 is anticipated by Maybach; and claims 19, 27 and 28 are anticipated by Livermore. In other words, of the ten Fleischel claims in suit, five—Nos. 6, 19, 23, 27 and 28, are anticipated by prior patents. It is very significant that neither Zelov, Maybach nor Livermore is cited as a reference by the Patent Office file record of Fleischel. This indicates that whatever consideration may have been given to these prior patents by the Patent Office Examiner, their importance was not properly recognized. Furthermore, this failure on the part of the Examiner helps to rebut the prima facie presumption of validity of the patent merely because of its issuance. Maibohm v. R. C. A. Victor Co., 4 Cir., 89 F.2d 317.

We further find that no one of these three prior patents, namely, to Zelov, Livermore and Maybach, when considered *alone,* anticipates *all* of the essential elements or factors embraced in the Fleischel specifications, or in *all* of the five claims of

Fleischel found to be anticipated by one or more of these three patents, when these five claims are considered either together 'or in conjunction with the other five claims in suit not found to be anticipated by any of these three patents.

The patent to Fleischel is a combination patent, and all of its elements need not be found in one and the same prior art patent, but may be pieced together from the disclosures of several such patents. However, there must be, in fact, such disclosures, and also they must be made in the same or an allied art, and in such manner that those reasonably well skilled in such an art would readily understand how and would be led, without the application of inventive skill, to piece together the several disclosures for the purpose of obtaining the result in question. In Great A. & P. Tea Co. v. Super Market Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, the Supreme Court gave a more precise and comprehensive definition of the test to be applied in determining the validity of a combination patent involving the mechanical arts, than it had ever previously given. The Court said, 340 U.S. at pages 150–153, 71 S.Ct. at page 129: "While this Court has sustained combination patents, it never has ventured to give a precise and comprehensive definition of the test to be applied in such cases. The voluminous literature which the subject has excited discloses no such test. It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term 'combination' to imply its presence and the term 'aggregation' to signify its absence, thus making antonyms in legal art of words which in ordinary speech are more nearly synonyms. However useful as words of art to denote in short form that an assembly of units has failed or has met the examination for invention, their employment as tests to determine invention results in nothing but confusion. The concept of invention is inherently elusive when applied to combination of old elements. This, together with the imprecision of our language, have counselled courts and text writers to be cautious in affirmative definitions or rules on the subject.

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' To the same end is Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334, and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. * * *

\*   \*   \*   \*   \*   \*

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

Applying the test, as thus laid down in the A. & P. Tea Company decision, to the Fleischel mechanism, it is clear that at least insofar as that mechanism is embodied in the combination in Fleischel's claims Nos. 6, 23, 27 and 28, such "combination which

only unites old elements with no change in their respective functions" and "has added nothing to the total stock of knowledge, but has merely brought together segments of prior art." See also Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973; General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; Mandel Bros. Inc., v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12; Vapor Blast Mfg. Co. v. Pangborn Corp., 4 Cir., 186 F.2d 230.

In view of the highly technical, intricate character of the mechanisms involved in the Fleischel claims; their great number and the confusing manner in which a great variety of changes in language is employed to embrace a great variety of alternate combinations in mechanism, we are not able to make a definite finding that any of the ten Fleischel claims in suit, other than claims Nos. 6, 19, 23, 27 and 28, are anticipated by prior art patents. On this question of anticipation we are thus in agreement with Professor Clauser, the neutral expert witness, except he did not find, as we do, that claim 19 is anticipated. See Chart prepared by him. (Clauser Exhibit No. 2).

### Question of Infringement.

In this Court's earlier opinion, 96 F.Supp. 904, in which the question of infringement alone was dealt with, the mechanism of Fleischel was fully analyzed and compared with the mechanism of the Packard Ultramatic device, which is alleged to infringe Fleischel. We find, as a result of the second hearing, that there is much that is contained in the earlier opinion that calls for little if any revision insofar as this comparative analysis is concerned. However, it appears appropriate, in order that this later opinion may be complete as respects this Court's findings on both the question of validity and the question of infringement, that we include here an analytical comparison of the two devices. This can best be done by analyzing the differences between the two.

These differences are six in number, as follows: (1) Fleischel embodies a standard starting clutch and the usual mechanical gear arrangements for speed ratio. Packard Ultramatic utilizes a torque converter instead of the standard starting clutch and employs no forward change speed mechanical gear arrangement for normal driving, except the change from the torque converter to high speed by a direct drive clutch. Packard claims that it thus obtains smoother engagement in starting, with no burning of clutch plates through clutch slipping, it being more important to guard against the latter in an automatic than in a non-automatic transmission, because in the former the driver can be more abusive of the clutch than where he has his foot on the pedal and knows when he is only partially engaging it. (2) With Fleischel a clutch must always be used to start the car from the engine. Packard Ultramatic starts and drives the car forward up to 55 miles an hour entirely through the torque converter. (3) Fleischel's clutch is progressively engaged. Packard Ultramatic clutch does not operate progressively but quickly with no intermediate positions. It is "all or nothing". (4) Fleischel's starting controls include a pressure regulating valve which is progressively operated over a wide range of rotation of the crank shaft from full de-clutch to full clutch position. The governor tends to move the valve when the engine is started. During starting, this regulating valve, in and of itself, measures the pressure of the oil to the servo-motor for the clutch. With Packard Ultramatic, the direct drive is either entirely closed or entirely open and is moved directly from one end position to the other end position. It is "all or nothing". This valve is not a regulating valve,—it does not regulate the oil pressure that flows to the direct drive clutch. It is in closed position when the car speed is below 13 miles per hour. (5) With Fleischel, the small piston (H) regulates the extent of the inlet opening to control the oil pressure to the clutch servo-motor, and the large piston (G) of Fleischel controls the discharge outlet, resulting in continuous regulation of pressure. Fleischel does not want the "all or nothing" operation in starting. With Packard Ultramatic, the ports or openings are the reverse of the arrangement in Fleischel,

the large piston controlling the inlet opening and the small piston controlling the discharge opening, resulting in an "all or nothing" operation. There is no progressive operation. (6) With Fleischel the starting governor exerting the force on the distributor is driven from the engine. If this starting governor were connected to the driving shaft, the engine could not start the car. With Packard Ultramatic, the governor is on the tail-shaft, and thus is driven at vehicle speed, and not at engine speed as with Fleischel. With Packard, the governor does not come into effective operation until the speed of the car reaches at least thirteen miles an hour, prior to which the torque converter is in operation.

Another advantage claimed by having the governor on the tail-shaft is in the nature of an emergency advantage in cold weather. Should the engine fail to start normally, if the car is then pushed the governor will come into operation at a given speed and will start the car.

From the foregoing comparative analysis of the two mechanisms, it will be seen that regulation of the fluid force to obtain progressive action and engagement of the clutch is basic to the Fleischel principle; whereas the corresponding Packard action is a quick and not a progressive one.

The question therefore immediately arises: Do any of the Fleischel claims in suit, when properly interpreted in conformity with the Fleischel patent specifications, embrace this difference between the two mechanisms as just explained? We conclude that they do not. Fleischel himself testified that his invention lies in the principle of his transmission whereby both speed and load are used for both the clutch operation and the gear-shifting operation, and that with respect to the clutch, one result is obtained when the speed of the car is retarded and another when it is increased, "and to use in my servo-motor a *modulated action* according to the load only." (Emphasis supplied). That is to say, Fleischel times his clutch engagement by the joint action of speed and load, and uses throttle position or manifold vacuum to adjust or modulate the clutch engaging force to just

the right amount to meet instantaneous driver demands.

Thus, even if we assume that the four claims, namely, Nos. 6, 23, 27 and 28 of Fleischel, which we have found to be anticipated by the prior art, have not in fact been anticipated, and if we examine them and also the remaining six claims in suit with the disclosures and teaching of the Fleischel patent before us, i. e., if we so examine all of the ten claims in suit, it is clear that none of them can be correctly interpreted as embracing the modulation which Fleischel claims is the basis of his invention. This is true because this modulation is not mentioned in any part of the Fleischel specifications. Thus, it is apparent that Fleischel is attempting to obtain for his patent an unwarranted breadth of interpretation. True, some of the claims themselves are so broadly drawn as to be capable of an interpretation inclusive of the modulated, progressive operation which Fleischel says is basic to his mechanism. However, his specifications, neither expressly or impliedly prescribe or embrace it, and claims must be responsive to the specifications of the patent. They must be interpreted in the light of the specifications and must not be broader than the actual invention therein described. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; Wheeling Stamping Co. v. Standard Cap & Molding Co., 4 Cir., 155 F.2d 6; Scott & Williams v. Whisnant, 4 Cir., 126 F.2d 19; Victor Cooler Door Co. v. Jamison Cold Storage Door Co., 4 Cir., 44 F.2d 288.

But even if Fleischel be permitted to interpret his invention as disclosing this modulating action, both in specifications and claims, it does not follow that Packard infringes Fleischel because, as already explained in detail, Packard neither contemplates nor obtains any modulated or progressive action but, on the contrary, a quick or "all or nothing" action, and there is nothing in either the specifications or claims of Fleischel that even suggest this. With Fleischel, the small piston regulates the extent of the inlet opening to control pressure to the servo-motor; and the large piston controls the discharge outlet, resulting

in continuous regulation of the pressure. Fleischel's objective is to moderate the pressure on the clutch, so that from the time the car is first given any motion until it attains a speed of about 14 miles an hour, the clutch is not fully engaged.

To repeat, in order to emphasize the difference which we believe to be a very distinct and material one, in Packard Ultramatic the functioning of the two pistons is just the reverse of those in Fleischel. In Packard, the large piston controls the inlet, instead of the small piston as in Fleischel; and Packard's small piston controls the discharge, with the result that when the oil enters between these two pistons, the valve skips over quickly. This valve, in and of itself, does no regulating. It simply moves the oil to the direct drive clutch. On the other hand, the arrangement and functioning of the corresponding parts in Fleischel do regulate, so the clutch can "play down."

It is here appropriate to point out Fleischel's assertion that his claims Nos. 26, 27 and 28 read on the Packard modulating valve and the manually controlled auxiliary clutch. This clutch is applied by the steering column lever, before *any* movement is given to the car. Its purpose is "to freeze" all the mechanism "back" of the torque converter, i. e. to have a break between the torque converter gear and the rear of the transmission, so that when the engine is started there will be no turning force applied to the tail shaft. But Livermore discloses the same mechanism. Therefore, even if we assume that Packard's manual control mechanism is like Fleischel's, since Livermore disclosed this same mechanism prior to Fleischel, there can be no infringement by Packard.

That Packard does not infringe any of the 10 Fleischel claims is definitely supported by the testimony of the neutral expert witness, Professor Clauser. He arrived at this conclusion primarily on the distinction between the Fleischel and the Packard mechanism embraced in what we have heretofore designated as the 5th basis of difference, i. e. the progressive operation of Fleischel as opposed to the quick or, as Professor Clauser characterized it, the flip-flop operation of Packard. We restate this 5th difference, previously given as follows: "With Fleischel, the small piston (H) regulates the extent of the inlet opening to control the oil pressure to the clutch servo-motor, and the large piston (G) of Fleischel controls the discharge outlet, resulting in continuous regulation of pressure. Fleischel does not want the 'all or nothing' operation in starting. With Packard Ultramatic, the ports or openings are the reverse of the arrangement in Fleischel, the large piston controlling the inlet opening and the small piston controlling the discharge opening, resulting in an 'all or nothing' operation. There is no progressive operation." This Professor Clauser found to be a very definite material difference and, to quote his own words, he described it as follows: "Fleischel's claims called for the fluid being controlled to exert a pressure on the distributor doing the controlling. The claims permit a reversal of this force, which gives an action quite different from any expressed in the specifications of the patent. The action that Packard Ultramatic uses is precisely this additional action not called for in Fleischel's specifications."

In other words Dr. Clauser found two things: (1) that the operations of Fleischel and Packard are materially different; and (2) that while the Fleischel claims in suit are broad enough in their phraseology to be said to include the Packard action, nevertheless, this action is not disclosed, either expressly or impliedly, in the Fleischel specifications. From these two conclusions, if they be sound, as we believe they undoubtedly are by the weight of the credible testimony and exhibits, there necessarily follows a third conclusion based upon a principle of patent law which we have heretofore stated, namely, that claims in a patent must be responsive to the specifications in that patent. They are to be interpreted as embracing only what is disclosed expressly by those specifications and what is to be impliedly embodied therein from the existing state of the art. Thus, the third necessary conclusion is that the Fleischel claims cannot be given a scope of interpretation that includes the Packard construction and oper-

ation, because not embraced within the patent specifications of Fleischel either expressly, or impliedly through the doctrine of equivalents.

Professor Clauser testified that Packard is not to be treated in the art as an equivalent of Fleischel. He testified that were he employed to construct, according to the specifications of the Fleischel patent and the ten claims here in suit, a combined starting and gear-shifting mechanism, in his opinion, based upon his scientific knowledge, his analysis of prior art patents and his experience in the art, it would not be permissible, instead of using the small piston of Fleischel—which regulates the extent of the inlet opening to control the oil pressure to the clutch servo-motor and the large piston which controls the discharge outlet, resulting in the continuous regulation of pressure,—to substitute the reverse construction as embodied in the Packard Ultramatic mechanism, namely, with the large piston controlling the inlet opening, and the small piston the discharge opening, resulting in no regulation of pressure, but in a single, quick movement. Professor Clauser stated that in his opinion the two arrangements were not to be considered in the art, equivalents, one for the other, entirely apart from the question as to which might be the more practical or desirable, because to so treat them would be to substitute what he called "a stabilized system", namely, the progressive action of Fleischel, for "an unstable system", namely, the quick or so-called "flip-flop" action of Packard.

█ The expert testimony presented on this point on behalf of plaintiff in opposition to Dr. Clauser's reasoning and conclusion was not convincing to the Court. While determination of the range of equivalents to be permitted is a question of law, it must be dependent upon the state of the art, for an understanding of which the courts must look to those skilled in the particular art. Dr. Clauser meets this requirement. He has had extensive practical as well as theoretical and laboratory training in this field of engineering. His reasoning and conclusion are logical and convincing,—all the more so since, as heretofore explained, Dr. Clauser was disposed to

classify the Fleischel patent as more of a pioneer patent than this Court is disposed to do, thereby entitling it to a wider range of equivalents.

While, as above stated, the question as to what constitutes an equivalent is a question of law, this question must be determined in the light of what is considered in the given art as a substitute for a particular element in, or a particular type of construction of the combination involved that constitutes the device in question. While experienced technicians such as Professor Clauser may, of course, err in their views as to what is to be considered in the particular art a practical, permissible substitute when given the above stated test, it is equally true that unless there is very clear, convincing proof that a court should reject the views of a completely impartial expert such as Professor Clauser, they should be accepted as indicating what, in patent law, is to be treated as an equivalent. Here it is appropriate to note that while it is true that Professor Shreeve, the neutral expert witness at the original trial of this proceeding, did take a broader view with respect to whether certain elements in the Fleischel structure were equivalents of those employed in the Packard structure, than the Court then took and still adheres to, Professor Shreeve made no such exhaustive analysis of the two mechanisms as Professor Clauser has made. He was not in fact required to do so, because the controversy at the first trial revolved primarily around the starting and clutch mechanisms of the two devices, whereas in this second trial, the testimony was greatly enlarged to include in much more detail the gear-shifting mechanisms as well.

██ The technical expert who testified on behalf of the plaintiff claims that there is no difference in operation between Fleischel and Packard, since the inlet and discharge openings of Packard are merely interchanged from their positions in Fleischel so that the governor force and the throttle force have the same effect and act in the same manner in both Fleischel and Packard. In other words, it is claimed that the difference is merely that which falls well within the spirit of Fleischel's teaching, and

that what Fleischel did was merely to select one of several possible arrangements to achieve his results and that such selection was illustrative only and not a limitation, since none of the wording in any of the claims in suit has any limitation which interferes with reading the claims directly upon the Packard construction. In support of this conclusion plaintiff relies upon such decisions as that in Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Morley Sewing Machine Co. v. Lancaster, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715; and Crown Cork & Seal Co. v. Aluminum Stopper Co., 4 Cir., 108 F. 845. We do not find that the facts in any of these cases are sufficiently analogous to be persuasive of plaintiff's contention. These decisions lay down the well established rule that in determining the question of infringement the two devices are to be examined in the light of what function they perform and how they perform it; whether one performs substantially the same function in substantially the same way as to attain the same result as the other; or whether they perform different functions or in a different way, or produce a substantially different result. They do not alter the equally well established principle of patent law that claims must be responsive to the specifications of the patent, and must not be broader than the invention described. As we have heretofore explained, we are satisfied that the Fleischel claims violate this principle.

The Court of Appeals in remanding this case so that the question of infringement might be passed upon at the same time as the question of validity, after stating, 193 F.2d at page 518, that "If infringement is avoided, it is because the claims of the patent are so limited and the range of equivalents is so narrowed by the prior art that what Packard does is not reasonably covered by the invention which it was the purpose of the patent to protect," stated as follows, 193 F.2d 518–519: "Very pertinent here with respect to the application of the doctrine of equivalents on the issue of infringement is the statement of the rule contained in Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, as follows: 'Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

" 'Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained.

" 'Inquiries of this kind are often attended with difficulty; but if special attention is given to such portions of a given device as really does the work, so as not to give undue importance to other parts of the same which are only used as a convenient mode of constructing the entire device, the difficulty attending the investigation will be greatly diminished, if not entirely overcome. Cahoon v. Ring, 4 Fed.Cas. p. 1011, No. 2,292, 1 Cliff. 620.

" 'Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape. Curtis, Patents 4th ed. sect. 310.' "

We have given very careful consideration to the aforegoing, as well as to all of the other decisions referred to in the opin-

ion of the Court of Appeals, and also those cited on behalf of the plaintiff, but we find in none of them anything which weakens our conviction that in the present case there is a definite, material difference in principle of operation between Fleischel and Packard which requires the same conclusion as a matter of law which the neutral expert, Professor Clauser, reached from his practical, scientific viewpoint. In other words, we do not believe that it can accurately be said, in the light of the prior art and the range of equivalents that is to be accorded the Fleischel patent even if we assume it partakes of the nature of a pioneer patent (which, as previously stated, we do not feel justified in doing), that the progressive action of the Fleischel valve is the equivalent of the single, quick action of the Packard valve.

There are many and vital distinctions between Fleischel and Packard in construction and operation that play a part in producing the aforegoing different results. For example, the fact that Packard does, and Fleischel does not employ a torque converter is not sufficient, in and of itself, to defeat infringement. But the purpose of the torque converter in Packard is not simply to get the car started. It can be brought into operation at any speed from 15 to 55 miles per hour. Again, if the governor were placed in Packard as it is in Fleischel, namely, on the engine instead of on the driven shaft, when the governor were speeded up to about 600 r. p. m., the clutch would come into engagement which is precisely what is not desired in Packard. Numerous other illustrations might be given to show that the two mechanisms are distinctly different in many ways, both as to construction and operation, and cannot be made to correspond, one with the other, in operation and result, without extensive vital changes in construction, in fact, without complete redesigning and reconstruction. With this, the neutral expert witness agreed. Furthermore, while it is true that development of Packard's Ultramatic device was, generally speaking, contemporaneous with the issuance of Fleischel's original patent, the weight of the credible evidence is clearly to the effect that Packard made no attempt to copy or to utilize what Fleischel disclosed.

Finally, with respect to the questions raised by the defendants in attacking the validity of the Fleischel patent as reissued, the Court desires to have a rehearing of these questions before rendering a decision thereon. They are numerous and varied in character and, as a result of additional briefs filed by counsel after the close of the second hearing, it appears that the questions involved are so important as to justify a more thorough presentation of them than has been given, especially in view of the time when the reissue was applied for, and the fact that 44 claims have been added to the patent.

To summarize: First, on the question of validity, claims 6, 19, 23, 27 and 28 of Fleischel reissue patent No. 23,326, are found invalid because anticipated by prior art patents. Second, on the question of infringement, none of the ten claims of this patent that are in suit, namely, claims Nos. 6, 19, 23, 24, 25, 27, 28, 29, 30 and 31, are found to have been infringed by the defendants' so-called Packard ultra-matic device. Third an adjudication of the additional questions that have been raised by the defendants with respect to the validity of the reissue of the Fleischel patent is reserved, pending further hearing.

An order will be signed in accordance with this opinion, the plaintiff to pay the costs.