## THE FOUNTAIN CITY.

### WESTERN TRANSIT CO. v. BENHAM.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1894.)

#### No. 102.

1. COLLISION—TRIAL—NAUTICAL ASSESSORS.

In a collision case, there is no error in the district judge calling to his assistance a navigator of experience as nautical assessor.

2. SAME—BETWEEN STEAMERS—FOG.

The steamer Fountain City collided with the tug Samson on a starlight night, when there was considerable fog on the water, so that neither vessel was visible from the deck of the other. The captain of the steamer testified that he first heard one blast of the tug's whistle, about one point on the port bow, and answered it, indicating that the vessels would pass port to port. Next he heard three blasts from the same point, indicating that the tug had a tow; and he answered with a single blast, and ported his helm, to give her a wider berth. At this time the mate reported from the crosstrees that the tug was on the port beam. He then heard two blasts from the tug, and answered them, and starboarded his helm. Then the tug gave a single blast, which he answered, and stopped his engines; but in a moment the tug was discovered ahead, and the collision occurred. *Held* that, as the position of the tug was doubtful,—her whistle sounding ahead, and the steamer's mate reporting her abeam,—the steamer was in fault, for not reversing when the captain heard the double blast, indicating a change of the agreement to pass port to port.

3. SAME.

The steamer Fountain City collided with the tug Samson in the nighttime, when fog on the water made each invisible from the deck of the other. The tug's lookout on top of the pilot house discovered the steamer about one point on the starboard bow. The tug gave two blasts, which were answered by the steamer, and starboarded her helm a little. A second signal of two blasts was answered from the same quarter, but the tug's third signal was not answered; and, though her officers became uneasy at this, she kept on until the collision occurred. *Held*, that the tug was in fault, for not stopping and reversing when her signal was not answered.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio.

This was a libel for collision filed by C. E. Benham against the steamer Fountain City (the Western Transit Company, owner and claimant). There was a decree for libelant. Claimant appealed.

This was an appeal in admiralty. C. E. Benham, the owner of the steam-tug Samson, filed his libel in the district court for the northern district of Ohio against the steamship Fountain City, to recover damages for a collision. His libel averred that about 1:30 o'clock on the morning of the 10th of May, 1887, the Samson was proceeding under check, at the rate of not more than three or four miles an hour, from Ashtabula to Buffalo, in Lake Erie, off Long Point, in a fog; that the men in charge of the Samson heard the whistle of a steamer, which proved to be the Fountain City, and sighted her masthead light through the fog at a considerable distance ahead, and on the starboard bow of the Samson; that the Samson blew a passing signal of two blasts, which was answered by the Fountain City by a signal of two blasts, and that these signals of two blasts were repeated by each vessel; that the Samson then changed her course one point, and the vessels continued on their respective courses, which were taking them a wide distance apart, starboard to starboard; that, suddenly, the Fountain City violating the agreement thus established, swung rapidly to starboard on a hard a-port wheel, and, proceeding at a great speed, crossed the bows of the Samson at nearly a right angle; that, as soon as those in charge of the Samson saw this change in the course of the Fountain City, they caused the Samson's engines to be reversed, and took every possible precaution to prevent the collision; and that, notwithstanding this, the Fountain City's forward gangway, on the port side, struck the Samson's stem, and raked across it, breaking it entirely off at the water line, and twisting it around to the port side, damaging the apron, and causing the Samson to spring a leak. The faults charged to the Fountain City were those of keeping no proper watch, proceeding at the too high and reckless speed of 9 or 10 miles an hour in a fog, in changing her course as above stated, and in not stopping and reversing. The Western Transit Company appeared as claimant of the Fountain City, and made answer. The answer averred that just before the collision the Fountain City was proceeding slowly on a course S. by W. ½ W., at a speed through the water not exceeding —— miles per hour, when those on board of her heard one blast of a whistle from a direction a little off the port bow, indicating that the steamer which afterwards proved to be the Samson was on the port side of the Fountain City, and would pass her on the port side; that the night was clear and starlit overhead, with considerable fog on the water, which was sufficient to conceal the tug from those on board the Fountain City, and the wind was light and north; that the steamer answered with one blast of the whistle, to indicate that the signal of the tug was understood by her, and ported about one point, so as to give the tug a wide berth; that the tug then sounded three blasts of her whistle, indicating that she had a tow; that this was from about the same direction that the first signal was heard; that the steamer responded with one blast, and ported another point, which put her on a course of about due west; that the tug drew closer to the steamer; that the tug then sounded two blasts of her whistle, and the steamer answered immediately with two blasts, and put her wheel to starboard; that then the tug sounded one blast, and the steamer responded with one blast, and put her wheel to port, and stopped her engines; that the tug was then seen close to the steamer, and showed a bright and green light, and was apparently nearly broadside to the steamer, and standing up the lake; that thereupon the steamer's wheel was put hard a-port, and its engine was signaled to start ahead; that almost instantly, and before the steamer swung to starboard more than a point, the tug, rapidly swinging to starboard, ran into the steamer, and struck her a slight glancing blow on the port side, near the forward fender; that the steamer was immediately stopped, and the tug drifted back of the stern of the

steamer, and disappeared in the fog. The district judge called to his assistance a nautical assessor, and found that the Fountain City was in fault—First, in that her mate, who was sent to the crosstrees to observe the tug, carelessly misjudged her position, and entirely misled his captain; second, in that the Fountain City was proceeding at too great a speed; and, third, in that the captain failed to stop and reverse when the signals he heard from the tug, and the report of the mate as to her position, were so at variance. The commissioner reported $965 damages, with interest thereon from the 1st of June, 1887; and a decree was entered for $1,278.53, together with the costs of the action.

Hoyt & Dustin and Hermon A. Kelley, for appellant.
H. D. Goulder, for appellee.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

TAFT, Circuit Judge, after stating the case, delivered the opinion of the court.

It is assigned for error that the district judge called to his assistance a nautical assessor, who was a captain of long experience in sailing the lakes. It has been the practice in this circuit, and particularly in that court over which so experienced and able an admiralty judge as Mr. Justice Brown presided for nearly 20 years, for the district judge to call to his assistance navigators of experience as nautical assessors. It was based on the practice, followed by the English admiralty judges, of advising with the elder brethren of Trinity House as to practical questions of seamanship and navigation. It has been approved by the supreme court of the United States, and it is of such long continuance that it is too late now to question its validity. In The Hypodame, 6 Wall. 216–224, Mr. Justice Grier, in commenting on the weight to be given to the finding of facts by the district courts in admiralty cases, uses this language:

"The district courts have better opportunities for examining such cases, and forming a correct conclusion, than any other. They may examine witnesses ore tenus, and, although they may not have Trinity masters to assist them, yet, in difficult cases, depending on nautical experience, the judge may call to his aid experienced masters of vessels (as is done in one district at least), whose report will greatly assist the court in coming to a correct conclusion."

The district referred to by the learned justice was the eastern district of Pennsylvania, as shown by footnote. We think the practice an admirable one, and one well adapted to assist the trial judge in reaching the right conclusion in an admiralty case.

The collision in this case occurred four years before the evidence was taken, and it is not surprising that there is great confusion among the witnesses as to what occurred. The statement of the master of the Fountain City is that after hearing a signal of three blasts from the approaching steamtug, which was nearly ahead, and a little off the port bow, he received a report from the mate that the tug was abeam, on the port side, and going up the lake in the same direction with the Fountain City; that thereafter a blast of two signals was heard from the tug, still but a point off the port bow, which he answered with two blasts, putting his wheel to starboard; that then he heard one blast from the tug, to which he responded

with one blast, hard a-ported his wheel, and stopped his engines. The mate of the Fountain City says that he saw the lights of the tug on the port beam, and reported them to the captain after all the signals had been blown, and not before the signals of two whistles, as stated by the captain. On the captain's evidence, there is not the slightest question that he was guilty of a fault, in not stopping and reversing, after hearing from the mate that the tug was on his port beam, and hearing from the tug signals of two blasts off his port bow, and nearly ahead. We considered, in the case of the North Star, 62 Fed. 71, the duty of steam vessels, when approaching each other in a fog, under rule 21 of section 4233 of the Revised Statutes, and held that a proper construction of the rule requires a steam vessel approaching another in a fog so that the bearing of the other's whistle is ahead, or but one or two points off either bow, to stop and reverse until the course and position of the other vessel can be definitely ascertained, unless the circumstances known to those in charge of the first vessel are such as would justify, in a careful and skillful navigator, the confident belief that the position and courses of the vessels will make them pass each other well apart. If we accept the statement of the captain of the steamer, it is clear that the position of the tug with reference to his steamer was not definitely ascertained when he heard the report of his mate that the tug was on his port beam, and then heard her double blasts nearly dead ahead. He had then every reason to fear that if he proceeded there was danger of collision. It became his duty, therefore, to stop and reverse. If the mate's statement is true, the captain failed in his duty, in not reversing when he stopped his engines at hearing the one-blast whistle from the tug. The one-blast whistle was a change from the agreement established by the exchange of two signals to pass port to port, and necessitated a reversing of the helm of the Fountain City. The one-blast whistle of the tug sounded less than a point off the port bow of the steamer, and they were nearing each other, so that in a few moments thereafter the tug became visible to the steamer. A change from one side to the other, with the tug but two or three minutes away, was obviously fraught with danger. It was clearly the duty of the captain, under these circumstances, not only to stop, but to reverse. Had he done so, there would have been no collision.

The argument is pressed upon us by counsel for appellant that the positions of the two vessels, at the time the one-signal blasts were said to have been exchanged, were those of vessels whose courses crossed, and that, by the rules prescribed by the board of inspectors of steam vessels for navigation, it was the duty of the Samson to port her wheel, and go under the stern of the Fountain City, while it was the duty of the Fountain City to keep her course or port her helm, if necessary to avoid collision, and that she had no right, therefore, to reverse. We think the rules referred to have no application to the situation of these two vessels, in a fog, and so near together, when neither knew the course or exact position of the other. But if they have

application the Fountain City was at fault, in not keeping her course, instead of stopping. The Britannia v. Cleugh (decided by the supreme court April 23, 1894) 14 Sup. Ct. 795; The Northfield v. The Hunter, 4 Ben. 112, Fed. Cas. No. 10,326. She should have done one thing or the other. She should have treated the situation as that of vessels in a fog approaching each other nearly head on, or as that of vessels whose courses were crossing, with the duty upon the tug to keep out of the way, and of the Fountain City to keep her course. The Fountain City did not follow the rules prescribed for either situation.

We fully concur with the district judge in his conclusion that the Fountain City was at fault in this collision, and that her fault was a contributing cause thereof; but we differ with the district judge in his conclusion that the tug was without fault, and we reach this result from the statements of the men upon the Samson. Their evidence is that, as their vessel was proceeding down the lake, they heard the whistle of the Fountain City, 10 or 15 minutes before the collision; that a lookout was sent up to the top of the pilot house, and through the mist, far above the water, caught a glimpse of the masthead light of the Fountain City, less than a point off their starboard bow; that the Samson then blew two blasts, which were answered by two from the Fountain City, still but a little off the starboard bow; that the Samson starboarded her helm a point, and then blew another blast of two whistles, which the Fountain City answered, still off the starboard bow, and widening a little; that then the Samson blew a third blast of two whistles, which was not answered, and that she starboarded another point, and kept right along under a slow check; and that a few minutes after her third signal she saw first the masthead light, and then the red light, of the Fountain City, less than a point off her starboard bow, swinging under what appeared to be a hard-a-port wheel across her bow. We think it very evident, from the testimony of the mate in charge of the tug, and her captain, who was in his room, and of her lookout, that the failure of the Fountain City to answer the third double blast, properly caused all who noticed it anxiety and alarm as to what the Fountain City was doing, where her exact position was, and what her course was. The mate was asked:

"How long after the third signal was it that you saw the masthead light of the Fountain City? A. Shortly afterwards. Q. How long would you say? Five minutes? A. A couple of minutes, probably. Q. That last signal, you say, you did not hear any response to? A. They never answered me but twice. Q. You never heard any blast or signal from the Fountain City after your second signal was blown,—after he replied to your second signal? A. No, sir. Q. When was it that you stopped the engine,—before or after you saw the masthead light? A. I stopped the engine just when I saw his masthead light."

The lookout said:

"We had already blowed two whistles, and we got two from the Fountain City. We ran on for about a minute or two, and our mate blew two whistles, and we got two back. Q. Where did they bear? A. Off on our starboard bow. We went on a little while longer, and blowed two, and we didn't get any from the Fountain City. Q. Go ahead. A. Well, then I heard the mate

say to the man at the wheel, 'Starboard half a point.' Before the man had starboarded her he said, 'Let her go a point.' So we ran along, and I was down forward at the time."

The captain of the tug was in his room, off duty. His evidence was as follows:

"Q. Now will you tell the court—starting with the time of your hearing two blasts blown on your whistle, and two blasts answered by some other vessel—all you know about the collision? A. Well, I think I heard the signal answered twice, if I remember right, and then I heard us give another signal; and it was not replied to, and I got out on deck. Q. What signal? A. Passing signal. Q. How many blasts? A. Two blasts. I did not hear it answered, and I came out on deck. Q. I wish you would, in your own mind, go right back there to your coming on deck, and tell the court how you came on deck? A. I came out of the door, which was on the port side, and walked forward only a short distance before I asked the mate, 'What is the trouble?' He says, 'There is a boat across our bow.' With that, I saw the outline of the boat in the fog myself."

On cross-examination he said, in answer to the question:

"Q. How long would you say that it was between the time of the last signal of two blasts and the boats coming together? A. Well, it might have been two and three minutes. Q. How long after that last signal was given were you on deck? A. As soon as I could get out there. It did not take a great while. Q. Had you taken your clothes off? A. Yes, sir; I did not wait to dress when I went on deck."

The lookout also says that the captain came running on to the deck.

It is very clear from this evidence that the failure of the Fountain City to reply to the third signal carried doubt as to her course to the minds of the mate, the captain, and the lookout. Counsel for appellee admits in his brief that there was then uneasiness on the part of those navigating the tug as to where the Fountain City was, and what she was doing. That uneasiness was born of uncertainty, and uncertainty in a fog, when the vessels are so close together, imperatively requires that they shall stop and reverse. A minute—perhaps two minutes—would have been gained, had the tug, instead of starboarding, stopped and reversed, when the Fountain City failed to answer. This would certainly have prevented the collision, because, as it was, the steamer struck the tug but a grazing blow. We think, therefore, that both vessels were at fault. We shall therefore enter a decree in this court dividing the damages found between the two vessels, and dividing the costs of the court below and of the appeal.