Donna REILLY, Peter Reilly and Heather Reilly, p.p.a., Donna Reilly and Peter Reilly, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 85–0748 P.

United States District Court, D. Rhode Island.

March 3, 1988.

Mark S. Mandell, Providence, R.I., for plaintiffs.

Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Defendant in the present action, the United States of America, has moved for a new trial pursuant to F.R.Civ.P. 52(b) and 59. Of the various grounds upon which defendant attempts to found its motion, only one requires comment. The other fourteen grounds defendant propounds are nothing more than a reiteration of that which was previously proffered to this court and ruled upon at trial or in its Opinion and Order of July 28, 1987, 665 F.Supp.

976. Unlike defendant, this court finds no value in the unnecessary repetition of previous rulings. Newly proffered, however, is defendant's objection to the appointment by this court of a technical advisor. Defendant claims that this court acted both improperly and without authority in making this appointment. Although defendant's objection is wholly without merit, confusing the appointment of a technical advisor with an expert witness under F.R.Evid. 706, this court believes that it is worthy of comment because of the rarity with which technical advisors are used by the United States judiciary.

### The Technical Advisor

"Proof of economic, scientific and technical facts," as one scholar noted at the 1958 Seminar on Protracted Cases for United States Judges, "has been studied ... so much that the significance of such proof and the urgency of developing ways of shortcutting it need no further emphasis." McGlothlin, "Some Practical Problems in Proof of Economic, Scientific and Technical Facts, Proceedings of the Seminar on Protracted Cases for United States Judges, 23 F.R.D. 319, 467 (1958). Recognizing the urgency of this problem and the concommitant need to educate members of the federal bench in new methods and procedures, the Judicial Conference of the United States adopted and published the Handbook of Recommended Procedures for the Trial of Protracted Cases. Therein, the Judicial Conference made formal recommendations with commentary. As "Recommendation 2" the Handbook avers that "[i]n an increasingly complex society, the judiciary and the bar should be ever alert to the possibilities of new techniques and devices which may improve the accuracy of, and expedite decisions involving scientific, technical or economic issues." Handbook of Recommended Procedures for the Trial of Protracted cases, 25 F.R.D. 351, 416 (1960). Following this recommendation the Handbook comments that

no one has yet devised a generally acceptable method of proof in respect to these issues of exact science. The cases and the issues differ vastly. Judges, so

far as we can learn, differ vastly in their preference for procedure. As of the time of this Handbook, five methods of resolving by evidence issues of facts in the exact sciences have been suggested or tried with greater or less success. They are here described.

Id. at 417. The procedure employed in the present case, the appointment of a neutral, technical advisor, is one of the five methods which the Handbook describes.

Briefly, the method contemplates the appointment of an expert to the judge's staff. The expert becomes, in effect, a specialized law clerk. He sits throughout the trial or otherwise familiarizes himself with the relevant testimony and evidence and then advises the court *in camera*. He does not testify or appear as a witness. Id. at 420. The role of the technical advisor may be viewed as fulfilling five separate functions. First, the technical advisor translates and interprets for the court the technical language used in the case. Second, he offers an exposition and delineation of the technical disagreement between the parties. Third, he relates this disagreement to the broader principles of the science or technical art involved. Fourth, he presents his own opinion on the technical facts and related matters at issue. Finally, he may conduct pertinent experiments, either on his own or in cooperation with others. See generally, Whinery, The Role of the Court Expert in Patent Litigation, Study of the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate, Study No. 8, 85th Cong., 1st Sess., 22, 41 (1958) [hereinafter Subcommittee Study No. 8].

### Background

In the present case, this court found itself confronted at trial with issues of profound economic complexity. Required to determine the damages for loss of earning capacity of an infant who had been negligently injured at birth, this court had to calculate a liquidated amount of damages for a little girl who would never be able to work, to see the world or walk about it, to talk to others or to feed and otherwise take care of herself in any way.

Untrained in the nature and nuances of economic functions, unable to scrutinize the relevance of alleged independent variables or objections thereto, uncertain of the grounds and bounds of valid economic inference, this court recognized its need of a guide to lead it through the maze of economic theory and fact. To this end, the present court decided to adopt the somewhat unusual but not unprecedented procedure of procuring neutral technical advice.

In its search for an economist to fulfill this role, this court naturally looked to the faculties of the universities surrounding Providence, Rhode Island, the seat of this District's federal courts. It is a well-accepted commonplace that university faculties are a rich source of neutral specialists. Not only are university professors most likely to be dissociated from any feature of the case, but they bring to the litigation a broad knowledge of the science or art involved, acquired through years of research and study. Moreover, in a large and protracted case, it is not unusual to discover that many of the leading experts in a particular scientific field who are not members of a university have been engaged as consultants to one of the parties to the litigation. See generally, Subcommittee Study No. 8, at 38; Judicial Conference of the United States, Interim Report of the Committee on Compensation of Expert Witnesses in Civil Litigation, committee memorandum, Exh. D, 1 (September, 1952) (memorandum of the late Hon. William C. Coleman) [hereinafter Interim Report].

After seeking approval for the appointment of a technical advisor from the Administrative Office of the United States Courts in Washington, D.C., and from Chief Judge Campbell of the United States Court of Appeals for the First Circuit, this court telephoned Dr. Feldman of Brown University. The conversation was brief. After explaining that the court desired to procure the services of a technical advisor and that such an advisor would be a member of the judicial staff, the court noted only that the case concerned an infant injured at birth and that the economic problem surrounded the determination of dam-

ages for loss of earning capacity. At this point in the conversation, Dr. Feldman asked if the name of the injured infant was Heather Reilly, informing the court that Mark Mandell, attorney for the plaintiff, had spoken to him about her case. The court then informed Dr. Feldman that the conversation could not proceed and, after receiving from him the names of a couple of other professors, ended the call.

This court then contacted another economist who stated that he would rather not become involved in matters surrounding a litigation. At this point, the court telephoned Dr. Arthur Meade of the University of Rhode Island. After having explained to Dr. Meade the nature of the position and outlined the general contours of the economic problem involved, Dr. Meade accepted the appointment conditioned on approval from the Administrative Office in Washington, D.C.. The procedure for securing proper authorization to appoint Dr. Meade as a technical advisor was then initiated.

Defendant now alleges that this court had no authority to appoint a technical advisor. This court is compelled to express its amazement at defense counsel's claim. The authority of a court to appoint a technical advisor has a history that is both long and clear. Whether one looks to statutory enactments in this country, or to its decisional law; whether one looks only within the jurisdictional boarders of our own land, or to the ancestral home of the common law; whether one looks to the provinces of law, equity or admirality: the answer is clear: a court has the power to appoint a technical advisor.

### Statutory Authority

■ This court begins its recitation of the statutory enactments that empower this court to appoint a technical advisor or consultant with the Administrative Expenses Act of 1949, ch. 744, 60 Stat. 806 (1949). Sensitive to the growing need of expert consultation in government, the Congress in section 15 of this Act granted the various departments and agencies that constitute the executive branch of our government the power, "when authorized in an appropriation or other Act," to "procure the temporary (not in excess of one year) or intermittent services of experts or consultants or organizations thereof...." Administrative Expenses Act, ch. 744, sec. 15, 60 Stat. 810 (1949) (originally codified as 5 U.S.C. sec. 55a) (recodified with amendment as 5 U.S.C. sec. 3109 (1966)). A decade later, Congress recognized that the judiciary as well as the executive branch required occasional recourse to expert consultation. Correcting their original oversight, Congress enacted legislation that granted to the judiciary the same power to hire experts and consultants that the executive branch enjoyed. In section 5(b) of Public Law 86–370, Congress enacted that "[t]he Director of the Administrative Office of the United States Courts, may, in accordance with the provision of section 15 of the Administrative Expenses Act of 1949 (5 U.S.C. 55a), procure the temporary or intermittent services of experts or consultants at rates not in excess of $75 per diem." Pub.L. No. 86–370, sec. 5(b), 73 Stat. 650, 652 (1959) (amending 28 U.S.C. sec. 445 (1940)) (recodified as 28 U.S.C. sec. 602 (1976)) (repealed by Court Interpreters Act, Pub.L. No. 95–539, sec. 8, 92 Stat. 2040, 2044 (1978)). As the House Report accompanying this legislation noted, "[s]ection 5(b) extends authority, now granted most executive departments and agencies, for the Director of the Administrative Office of the U.S. Courts to procure services of consultants in accordance with section 15 of the Administrative Expenses Act of 1949." H.Rep. No. 1138, 86th Cong., 1st Sess. (1959) reprinted in 1959 U.S. Code Cong. & Admin. News 2826, 2829.

In the Appropriations Act of 1978, Congress expressly extended the scope of section 15 of the Administrative Expenses Act of 1949, codified as 5 U.S.C. sec. 3109, to govern the judiciary's employment of experts and consultants. Appropriations Act of 1978, Pub.L. No. 95–86, title IV, sec. 402, 91 Stat. 419, 436 (1977). Section 402 enacted that "[a]ppropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. 3109." Id. Fourteen months later, recog-

nizing the redundancy that this legislation created in the United States Code, Congress repealed section 5(b) of Public Law 86–370, codified as 28 U.S.C. sec. 602 (1976), by section 8 of the Court Interpreters Act, Pub.L. No. 95–539, 92 Stat. 2040, 2044 (1978). As the House Report accompanying the court Interpreters Act notes, "[s]ection 8 repeals a previous statute authorizing the Director to procure the services of experts and consultants. The provision repealed was superseded by the authorization to the Director in the annual judicial branch appropriations acts." H.Rep. No. 1687, 95th Cong., 2d Sess., 13 (1978) reprinted in 1978 U.S. Code Cong. & Admin. News 4652, 4664.

As well as repealing section 5(b) of Public Law 86–370, section 5 of the Court Interpreters Act enacted by amendment an entirely new section 602 of title 28. Court Interpreters Act, Pub.L. No. 95–539, sec. 5, 92 Stat. 2040, 2044 (1978). Especially noteworthy is section 602(c) of this amendment. This subsection codifies the authority of the Director of the Administrative Office of the U.S. Courts to employ experts and consultants enacted in section 402 of the Appropriations Act of 1978. Section 602(c) states that "[t]he Director may obtain personal services as authorized by section 3109 of title 5, at rates not to exceed the appropriate equivalent of the highest rate of pay payable for the highest grade established in the General Schedule, section 5332 of title 5." 28 U.S.C. sec. 602(c). As the House Report accompanying the Court Interpreters Act notes, "[s]ubsection (c) contains the necessary authority for the Director to obtain the services of experts and consultants as authorized by section 3109 of title 5, United States Code. The section merely codifies the authority which the Director now has as a result of a regular provision in the judicial appropriations. See, e.g., Judiciary Appropriations Act, 1978, Public Law No. 95–86, title IV, 402, 91 Stat. 436." H.Rep. No. 1687, 95th Cong., 2d Sess., 12 (1978) reprinted in 1978 U.S. Code Cong. & Admin. News 4652, 4663.

While hitherto only the Director of the Administrative Office of the U.S. Courts has been mentioned, section 602(d) of title 28, also enacted by section 5 of the Court Interpreters Act, "authorizes the Director to delegate authority (except authority to promulgate rules and regulations) to such officers and employees of the judicial branch of government as he or she may designate, with or without power to redelegate." H.Rep. No. 1687, 95th Cong., 2d Sess., 13 (1978) reprinted in 1978 U.S.Code Cong. & Admin.News 4652, 4663. Specifically, section 602(d) states that "[t]he Director may delegate any of the Director's functions, powers, duties, and authority (except the authority to promulgate rules and regulations) to such officers and employees of the judicial branch of Government as the Director may designate, and subject to such terms and conditions as the Director may consider appropriate...." 28 U.S.C. sec. 602(d). It continues that the Director "may authorize the successive redelegation of such functions, powers, duties, and authority as the Director may deem desirable." Id. Finally, this subsection concludes that "[a]ll official acts performed by such officers and employees shall have the same force and effect as though performed by the Director in person." Id. Accordingly, there can be no question that a federal judge may also enjoy the authority and power to appoint an expert or consultant pursuant to these statutory provisions when properly designated by the Director or by an officer or employee duly empowered to so designate.

This survey of the relevant legislation demonstrates incontrovertibly that when properly designated to act pursuant to 5 U.S.C. sec. 3109, a federal judge "[w]hen authorized by an appropriation or other Act ... may procure the temporary (not in excess of one year) or intermittent services of experts or consultants or organizations thereof...." Applied to the appointment of a consultant in the present case, this result completely vindicates this court against any allegation of wrongdoing or *ultra vires* activity. On February 10, 1987, this court wrote to the Administrative Office for the U.S. Courts requesting permission to appoint a consultant pursuant to 5

U.S.C. sec. 3109 at a cost not to exceed $1,000.00. This court informed the Administrative Office that it would seek to make this appointment from one of the faculties of the universities located in Rhode Island. Finally, this court further informed the Administrative Office that a consultant was needed because of the highly technical and arcane aspects of the case involving economics. On March 2, 1987, the Deputy Director of the Administrative Office replied that the Administrative Office has "no difficulty fulfilling your request."[1] The Deputy Director then proceeded to outline two different procedures by which the appointment could be made.

Having shown that the authority to appoint a consultant pursuant to 5 U.S.C. sec. 3109 had been delegated, it remains only to discover whether this court satisfied the requirement of section 3109 that there be authorization by an appropriation or other Act before an appointment is made. A perusal of the Judiciary Appropriation Act of 1987, Pub.L. No. 99–591, sec. 101(b), title IV, 100 Stat. 3341–61, discloses that the requisite authorization by appropriation did indeed exist. Section 410 of the Judiciary Appropriation Act of 1987 enacts that "[a]ppropriations and authorizations made in this title which are available for salaries and expenses shall be available for services as authorized by 5 U.S.C. sec. 3109." Judiciary Appropriation Act of 1987, Pub.L. No. 99–591, sec. 101(b), title IV, sec. 401, 100 Stat. 3341–61, 3341–63.

In sum, the ineluctable conclusion must be drawn that with properly delegated authority from the Director of the Administrative Office of the U.S. Courts and with the requisite authorization by appropriation under section 401 of the Judiciary Appropriation Act of 1987, this court acted within the ambit of its authority pursuant to 5 U.S.C. sec. 3109 when it appointed a consultant to advise and instruct this court on the myriad and arcane aspects of economic science necessary to a just adjudication of the present case.

## Inherent Authority

Although certainly a sufficient source of authority to appoint an advisor to the court, the complex of legislation considered in the preceding section is, strictly speaking, unnecessary. It is a long standing principle of judicature that a court has the inherent authority to appoint an advisor. "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." *In re Peterson*, 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920) (Brandeis, J.).

In american jurisprudence, the most articulate and extensive acknowledgement of this power of courts sitting either at law or in equity was made by Justice Brandeis. Surveying earlier decisional law by the Supreme Court on this authority in the case of *In re Peterson*, Justice Brandeis, writing for the majority, observed that the inherent authority of a court "includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause." Id. at 312, 40 S.Ct. at 547. "From the commencement of our government," Justice Brandeis continues, "it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners, and commissioners." Id. at 313, 40 S.Ct. at 547. Justice Brandeis further notes that "[t]o take and report testimony; to audit and state accounts; to make computations; to determine, where the facts are complicated and the evidence voluminous, what questions are actually in issue; to hear conflicting evidence and make finding thereon—these are among the purposes for which such aids to the judge have been appointed." Id. Finally, he notes that "[t]he inherent power of a federal court to invoke such aid is the same

---

1. In an abundance of caution and concern for proper judicial decorum, this court exceeded the statutory requirements necessary to appoint a court advisor and sought, in addition to these requirements, approval for the proposed appointment from the First Circuit Council. At the Circuit Council meeting of April 15, 1987, the proposed appointment was approved.

whether the court sits in equity or at law." Id. at 314, 40 S.Ct. at 548.

No less a light than Chief Justice Marshall has concurred in this judgment. In *Field v. Holland*, 10 U.S. (6 Cranch) 8, 3 L.Ed. 136 (1810), confronted with petitioner's contention that a lower court's appointment of an auditor was tantamount to the submission of the case to arbitration without consent of the parties, or more precisely, "to a reference of the cause to consent," Chief Justice Marshall, writing for the majority, held that "this court is unanimously of opinion, that the view taken of this point by the plaintiffs is incorrect." Id. at 21. Chief Justice Marshall continued that "[t]he order in question bears no resemblance to a rule of court referring a cause to arbiters. It is a reference to 'auditors,' a term which designates agents or officers of the court, who examine and digest accounts for the decision of the court." Id. "They do not decree," the Chief Justice emphasized, "but prepare materials on which a decree may be made." Id.

Echoing this insight of Chief Justice Marshall into the usefulness of such advisory aids to a court, Chief Justice Waite, writing for the majority in *North Carolina R.R. v. Swasey*, 90 U.S. (23 Wall.) 405, 23 L.Ed. 136 (1875), notes that "[a] master's report settles no rights." Id. at 410. Like the office of any other advisory aid, "[i]ts office is to present the case to the court in such a manner that intelligent action may be there had, and it is this action by the court, not the report [if one is requested], that finally determines the rights of the parties." Id. One does well to emphasize these remarks of Chief Justice Marshall and Chief Justice Waite because it is a common, though misconceived, complaint of litigants that the use of court advisors may adversely affect their rights. As Justice Field has remarked, commenting on the use of such aids while writing for the majority in *Kimberly v. Arms*, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764 (1889), "[t]he information which [the advisor] may communicate by his findings in such cases, upon the evidence presented to him, is merely advisory to the court, which it may accept and act upon, or disregard in whole or in part, according to its own judgment as to the weight of the evidence." Id. at 523, 9 S.Ct. at 359. In the final analysis, it is always the court, and never the advisor to the court, that determines the result of an adjudication.

Accordingly, caselaw dating from this century and extending back to the early youth of our republic has propounded time and again the inherent authority of courts to appoint advisors to assist them in the performance of their duties. Nor is the holding of *Henkel v. Chicago*, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), to the contrary. The issue raised in *Henkel* was whether a federal district court could include expert witness fees as part of the taxable costs in a law case. The Supreme Court answered no. It mattered not whether the district court was sitting in a state which permitted the inclusion of expert witness fees as part of the taxable costs, the area had been preempted by federal legislation. A number of commentators and judges have read *Henkel* to limit the federal judicial power of appointing advisors to consensual arrangements with the parties unless otherwise provided by Congress. See Subcommittee Study No. 8, supra, at 27; Whinery, Court Experts and the Proof of Scientific Facts—An Experiment in Law Reform, Proceedings of the Seminar on Protracted Cases for United States Judges, 23 F.R.D. 481, 491 (1958). This reading, however, is incorrect. In *Henkel*, the expert had been called by a party, not appointed by the court. Moreover, while the federal legislation surveyed in *Henkel* was in existence when *In re Peterson* was decided, this legislation did not affect the holding of that case. Writing for the majority in *Henkel*, Chief Justice Hughes distinguished *In re Peterson* by expressly noting that "[i]n Ex Parte Peterson ... the question related to the fees of an auditor appointed by the court, and as the court had power to appoint him, and there was no statute or rule of court on the subject, the court had authority to allow the expense in the items taxable as costs." *Henkel v. Chicago*, 284 U.S. at 447, 52 S.Ct. at 225. With this remark the

holdings of *In re Peterson* were reaffirmed. The federal courts had the power to appoint aids as well as the power to tax the expense of these aids to the parties. Justice Brandeis had correctly recognized that "[a]s Congress [had] made no provision for paying from public funds [the expense of such aids], the power to make the appointment without consent of the parties is practically dependent upon the power to tax the expense as costs." *In re Peterson*, 253 U.S. at 315, 40 S.Ct. at 548. Today, of course, the issue of whether a court has the inherent power to tax to the parties the expense of consultants or aids is no longer important, as Congress has made provision for paying from public funds the expense of such aids. See 5 U.S.C. sec. 3109 and, e.g., Judiciary Appropriation Act of 1987, Pub.L. No. 99–591, sec. 101(b), title IV, sec. 401, 100 Stat. 3341–61, 3341–63. Nonetheless, it is worth emphasizing that far from confuting earlier caselaw countenancing the judicial power to appoint a court advisor, the holding of *Henkel* comports with it.

Nor is the history of american law unique in recognizing the inherent authority of a court to appoint advisors prior to statutory enactments acknowledging this power and providing public funds for the exercise of it. English law has tread the same path. For example, in *Lushington v. Boldero*, 56 Eng.Rep. 1048 (V.C.1819), the Vice–Chancellor had to decide, in the absence of any statute, whether the lower court's appointment of an individual schooled in the science of forestry was proper. The case concerned a devise of land giving an estate for life unimpeachable of waste with a remainder over. Apparently, the issue before the lower court had been whether the removal of timber by the tenant for life had violated the devisor's intent. The Vice–Chancellor observed that "where an estate for life unimpeachable of waste was given, with a remainder over, the intention of the testator was presumed to be, to preserve entire the succession of the estate, but to give to the tenant for life the full profit that could be derived from a fair course of enjoyment." Id. at 1048–49. Moreover, the Vice–Chancellor

further observed "[t]hat the destruction of timber which the testator had either planted or preserved for ornament or shelter was inconsistent with the fair enjoyment which he intended, and with the preservation of the succession." Id. at 1049. Nonetheless, the removal of timber that was either decayed or injurious to adjoining trees could be removed because removing such timber furthered the intent of the testator. Whether the timber removed was of this latter kind, however, the lower court was not competent to decide. Accordingly, it appointed a consultant trained in forestry to inquire and advise the court "whether any and which of the timber and other trees so cut and sold injured or impeded the growth of any other trees adjoining thereto, which were of so much importance to the purposes of ornament and shelter intended by the devisor, that the removal of the timber or other trees so cut and sold was essential to such purposes of ornament or shelter." Id. The Vice–Chancellor held that the appointment of this advisor was proper.

The general power of a court to appoint an advisor, often called a master or assessor, was acknowledged in the Court of Chancery Act, 1852, 15 & 16 Vict., ch. 80, sec. 42. One of the English Rules of Court taken from this Act gives express recognition to this power. R.S.C. Ord. 55 r. 19 provides that "[t]he Judge in chambers may, in such way as he thinks fit, obtain the assistance of accountants, merchants, engineers, actuaries, and other scientific persons the better to enable any matter at once to be determined, and he may act upon the certificate of any such person." See also R.S.C. Ord. 36 r. 2.

On both sides of the Atlantic, therefore, common law countries have acknowledged the inherent power of a court to appoint advisors to assist it in the performance of its duties. Nor has this power and authority been limited to any particular area of adjudication. Court appointed advisors have been used by courts sitting in admiralty, at law and in equity. The history of the use of court advisors by courts of admiralty, equity and law is long and varied and

the parchment upon which this history is written, richly illustrated with both caselaw and statute.

### Advisors in Admiralty

One of the earliest collections of statutory provisions authorizing the use of advisors by a court of admiralty in medieval Europe is known as the Valencian Regulations. The Valencian Regulations, issued between 1336 and 1343 by Peter IV of Aragon, provide for the guidance of the Courts of the Consuls of the Sea at Valencia. Similar to subsequent regulations issued by other kings of Aragon in Majorca (c. 1343), Barcelona (c. 1347) and Perpignan (c. 1348), the Valencian Regulations proved a model as well for at least one procedure adopted by the english courts of admiralty. See the Judicial Order of the Courts of the Consuls of the Sea, ch. XXXVI, reprinted in 4 Black Book of the Admiralty 489 (Rolls Series 1876) [hereinafter the Valencian Regulations].

The Courts of the Consuls of the Sea heard and settled disputes between members of the Merchants' Guild and members of the Mariners' Guild. See Beuscher, The Use of Experts by the Courts, 54 Harv.L. Rev. 1105, 1109–10 (1941) [hereinafter The Use of Experts]. The Courts of the Consuls of the Sea were composed of lower courts presided over by consuls, appointed for one year, and an appellate court presided over by a judge of appeal, also appointed for one year. The Valencian Regulations provide for the consultation of these consuls and judge with prudhommes of the sea and of the merchants, freemen regarded knowledgeable in the customs of the sea and market, respectively. For example, chapter LXI of the Valencian Regulations states that "sentences which are given by the said consuls and judge, are given according to the written Customs of the Sea, and in accordance with what is declared in the different chapters of them." Valencian Regulations, at 493. But, it continues, "where the customs and chapters are not sufficient, they give them upon consultation with the prudhommes of the merchants and of the sea, that is, always according to the majority of the voices in counsel, regard being had to the persons who give their advice." Id. This last clause underscores that it is the consul or judge, bound by custom, who issues the final judgment and that the role of the prudhommes is strictly advisory, assisting the judge or consul ascertain the relevant customary practice.

The advisory character of the prudhommes is further noted in chapter XVII of the Valencian Regulations. After setting forth the general procedure to be employed in consultation with the prudhommes, chapter XVII concludes that "in the form above declared the said consuls go and take counsel with the prudhommes of the sea upon the said matter, and when they have taken the said advice by parole they give sentence in the matter." Id. at 469–71. That the consuls and judge are to follow custom and not simply the advice of the prudhommes becomes even clearer in chapter X of the Valencian Regulations. Anticipating a case in which the advice given by the prudhommes of the sea conflicts with the advice given by the prudhommes of the merchants, chapter X suggests that the consul or judge resolve this conflict by considering which customary practices are most appropriately applied to determining the matter in issue: contracts, for example, being more properly determined by the advice of the former. Id. at 463; see also The Use of Experts, supra, at 1110.

Moving from statute to caselaw and from the early fourteenth century to the seventeenth, the ancient use of court appointed advisors may be traced to a case before the King's Bench in 1648. Adopting the use of advisors from the Courts of the Consuls of the Sea at Valencia, the English Admiralty Court, during its separate existence, sought the advice of members of the Elder Brethren of the Holy and Undivided Trinity, the somewhat unusual name for the sea captain's club better known as the Corporation of Trinity House chartered in 1514 by Henry VIII. The Brethren of Trinity House typically had at least four years of experience as shipmasters. The Use of Experts, supra, at 1110 n. 27. The practice

of seeking advice of these masters in maritime cases was continued by the common law courts when they began to usurp the jurisdiction of the Admiralty Court. Of particular interest is the case of *Pickering v. Barkley*, 11 Eng.Rep. 587 (K.B.1648), one of the earliest reported cases using marine advisors. *Pickering* involved an action brought upon a covenant to carry goods. For good consideration, Barkley had agreed to carry goods for Pickering and to "bear all losses and damage which should befall the ship, or merchandises in her, excepting only perils of the sea." *Pickering*, 11 Eng.Rep. at 587. During her voyage, Barkley's ship was attacked and taken by "peradventure English men," *per quosdam ignotos homines bellicosos.* Id. Barkley argued that he should be excused from the performance of the covenant because "to be taken and robbed by pirates is a danger of the sea, even as tempestuous winds, and shelfs, and rocks are." Id. Pickering, however, demurred to this plea and argued that "this was not a danger of the sea, but a danger upon the sea." Id. To determine whether the taking of a ship by pirates was a peril of the sea or upon the sea, the Justices of the King's Bench sought the advice of Granly, the Master of the Trinity House, and other sufficient merchants, who advised the court that "the taking by pirates are accompted perils of the sea.". Id. Judgment was given *nihil capiat per billam*, for defendant.

In 1861, with the passage of the Admiralty Court Act, 1861, 24 & 25 Vict., ch. 10, Parliament extended this practice by empowering the masters of Trinity House to inspect ships, locations and other articles as well as advise the court on marine practices. Moreover, this Act also permitted the initiation of this procedure by the parties to the action. Section 18 of this Act enacted that "[a]ny party in a cause in the high court of admiralty shall be at liberty to apply to the said court for an order for the inspection by the trinity masters ... of any ship or other personal or real property, the inspection of which may be material to the issue...." Admiralty Court Act, 1861, 24 & 25 Vict., ch. 10, sec. 18.

Although not widely practiced in the United States, the practice of seeking advice from masters and assessors has been followed in some courts and referred to with approval by others. 3 Benedict, The Law of American Admiralty, sec. 381(b) (6th ed. 1940). The Supreme Court itself has acknowledged the availability of this procedure and remarked upon it with approval. In the case of *In re Propeller Hypodame*, 73 U.S. (6 Wall.) 219 (1868), the Court stated that "[t]he district courts have better opportunity for examining such cases [involving conflicting and irreconcilable testimony] and forming a correct conclusion than any other." Noting the various procedures available to district courts, the Court continued that "[t]hey may examine witnesses *ore tenus*, and although they may not have Trinity masters to assist them, yet in difficult cases depending on nautical experience the judge may call to his aid experienced masters of vessels (as is done in one district at least), whose report will greatly assist the court in coming to a correct conclusion." *In re Propeller Hypodame*, 73 U.S. (6 Wall.) at 224.

Chief Justice Taft, as a circuit judge, wrote in the case of *In re Fountain City*, 62 F. 87, 89 (6th Cir.1894), that "[i]t has been the practice in this circuit ... for the district judge to call to his assistance navigators of experience as nautical assessors." He continued that this practice is "based on the practice, followed by the English admiralty judges, of advising with the elder brethren of Trinity House as to practical questions of seamanship and navigation." *In re Fountain City*, 62 F. at 89. The Chief Justice concludes that "[i]t has been approved by the supreme court of the United States, and is of such long continuance that it is too late now to question its validity." Id. Speaking for the court, the Chief Justice states that "[w]e think the practice an admirable one, and one well adapted to assist the trial judge in reaching the right conclusion in an admiralty case." Id.

### Advisors in Equity

To indicate the use of court appointed advisors at equity, this court now considers

their use in the law of patents. The law of patents, or least that part of it concerned with perfect equity, adjudicates claims to equitable titles and rights. The use of a court appointed advisor at equity received statutory acknowledgement in England with the passage of the Patents and Designs Act of 1907. This Act recognized the virtues of securing advisory experts to illuminate highly technical matters for both trial and appellate courts. Section 31(1) of this Act announced that "[i]n an action or proceeding for infringement or revocation of a patent, the court may, if it think fit, and shall on the request of either of the parties to the proceedings, call in the aid of an assessor specially qualified, and try the case wholly or partially with his assistance; ...." Patents and Designs Act, 1907, ch. 29, sec. 31(1). Section 31(2) acknowledged the use of court appointed advisors by the court of appeal as well. Id. at sec. 31(2).

The Patents Act of 1949 also provides for the appointment of advisors by the court. In contrast to the Patents and Designs Act of 1907, however, the Patents Act of 1949 more forcefully emphasizes the need of a court to obtain the assistance of those with scientific expertise. Section 84(2) of this Act requires that "[r]ules of court shall make provision for the appointment of scientific advisers to assist the court in proceedings under this Act, and for regulating the functions of such advisers." Patents Act, 1949, ch. 87, sec. 84(2).

In the United States, Judge William C. Coleman of the District Court for the District of Maryland employed court appointed technical advisors in patent cases. See *Carter Products, Inc. v. Colgate–Palmolive Co.*, 130 F.Supp. 557 (D.Md.1955), aff'd 230 F.2d 855 (4th Cir.1956), cert. denied 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956); *Specialty Equipment & Machinery Corp. v. Zell Motor Car Co.*, 113 F.Supp. 161 (D.Md.1953). Judge Coleman claimed that technical assistance was desirable in fifteen percent of the patent cases that came before his court. Subcommittee Study No. 8, at 34. Typically, Judge Coleman would encourage the parties in a case to participate in the selection of a neutral advisor, but if the parties could not agree upon a particular person, then the court would make the selection. Interim Report, Exh. D, at 1. Judge Coleman called this procedure the use of inter-partes neutral witnesses because the Judge would instruct the court appointed advisor to take the stand and permit the parties as well as the court to examine him. In contrast, Judge Fee of the District Court for the District of Oregon, who employed a similar procedure, did not permit the court appointed advisor to testify in court. According to Judge Fee, the court appointed advisors that he employed in complex litigations had no responsibility beyond advising the judge. Interim Report, at 4. He found this use of technical advisors appointed by the court highly satisfactory. Id.

While, unlike England, no statute acknowledging the authority of a court to appoint a technical advisor in patent cases exists in the United States, the Science Advisory Board, in a report requested by the Secretary of Commerce, called for the mandatory and uniform use of technical advisors long ago. In 1936, the Science Advisory Board claimed that "[i]t should be mandatory upon Federal district courts in equity patent cases to utilize the services of either a technical advisor or a technical jury, but the court should be free to select either alternative and should make the selection anew for each suit." Science Advisory Board, Report of the Committee on the Relation of the Patent System to the Stimulation of New Industries, 18 J. Patent Office Soc'y 94, 101 (1936). The Science Advisory Board stressed, however, that "[w]hen an advisor is utilized he should be merely advisory to the Court and his report, if called for by the Court, should have the same presumption of accuracy as a master's report has, under the Equity Rules." Id. Justifying its position, the Science Advisory Board observed that

> [w]hen the technique involved was simple, before science had made the great strides of the past generation and before the fruits of its progress became applied and embodied in patents, the judge could readily acquire during the progress of a suit that background necessary for him

to understand the technical facts presented to him. To expect him to do so today, with the present specialization and intensification of technical knowledge, leads to the placing of a severe burden upon him and to undue expense to the litigants.

Id. at 100. Following these remarks, the Science Advisory Board stated that *"[w]e therefore recommend that there be provided scientific or technical advisors or juries to furnish adequate scientific or technical assistance to courts of first instance in equity patent causes."* Id. at 101 (emphasis in original).

### Advisors at Law

As may be discerned from the citations of caselaw in earlier sections of this opinion, the judicial use of technical advisors appointed by the court has a long history at law. Justice Brandeis, writing for the majority in the case of *In re Peterson*, leaves no doubt on this score: "[t]he inherent power of a federal court to invoke such aid is the same whether the court sits in equity or at law." *In re Peterson*, 253 U.S. 300, 314, 40 S.Ct. 543, 548, 64 L.Ed. 919 (1920); see also *Field v. Holland*, 10 U.S. (6 Cranch) 8, 3 L.Ed. 136 (1810) (Marshall, C.J.); *North Carolina R.R. v. Swasey*, 90 U.S. (23 Wall.) 405, 23 L.Ed. 136 (1875) (Waite, C.J.); *Kimberly v. Arms*, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764 (1889). The Supreme Court has countenanced this procedure often enough that the words of Chief Justice Taft, said while his court sat in admiralty, are equally applicable to the use of this practice by a court sitting at law: "[i]t has been approved by the supreme court of the United States, and is of such long continuance that it is too late now to question its validity." *In re Fountain City*, 62 F. 87, 89 (6th Cir.1894).

Moreover, in addition to this caselaw, the use of technical advisors by courts of law has been acknowledged by both statute and rule. In England, section 3(1) of the Industrial Courts Act of 1919 provided that "[t]he Minister may make, or authorize the Industrial Court to make, rules regulating the procedure of that Court, and those rules may, amongst other things, ... pro-vide for enabling the Court to sit in two or more divisions, and to sit with assessors, who may be men or women...." Industrial Courts Act, 1919, 9 & 10 Geo. 5, ch. 69, sec. 3(1). Giving greater emphasis to the needs of a court to obtain sound scientific expertise, the English Rules of Court have affirmed the appointment of advisory experts by noting that "[t]he Judge in chambers may, in such way as he thinks fit, obtain the assistance of accountants, merchants, engineers, actuaries, and other scientific persons the better to enable any matter at once to be determined...." R.S.C.Ord. 55 r. 19; see also R.S.C.Ord. 36 r. 2.

Within our own First Circuit, one court has provided an exemplary guide to the worth and vitality of this practice to courts of law. Judge Wyzanski of the United States District Court for the District of Massachusetts appointed a technical advisor to assist and advise him *in camera* during an especially complicated antitrust case. In the huge monopolization case of *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), aff'd 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), Judge Wyzanski found himself faced with complicated issues of fact and law involving economic factors that would play a large role in the decision. Recognizing his need of technical assistance to properly adjudicate this case, Judge Wyzanski contacted the Economics Department of Harvard University. This inquiry led to the appointment of an economics professor as court advisor. In addition to discussing the case with this economist in chambers, Judge Wyzanski had him submit, at the conclusion of the trial, a memorandum analyzing the facts of record and suggesting remedies. See Webster & Hogeland, The Economist in Chambers and in Court, 12 A.B.A. Section of Antitrust Law Proceedings 50, 52, 65–67 (1958). Judge Wyzanski used the memorandum like the briefs of the parties, although he did not permit the parties to inspect it. Id. While the economist resigned after submitting his memorandum, a draft of the court's findings, conclusions, and decree was subsequently submitted to him for comment. The fol-

lowing year, the Supreme Court affirmed Judge Wyzanski's opinion, implicitly condoning his method which had received great notoriety because of the importance of the case.

*United Shoe* is especially apposite to the case at bar. Like the court in *United Shoe,* this court found itself faced with complicated issues of fact and law that would play a large role in the decision. Also like the court in *United Shoe,* this court recognized its need of technical assistance to properly adjudicate this case. Like that court, this court made inquiries to the economics departments of local universities and like that court, it appointed a economics professor from one of their faculties. Continuing the parallels, this court discussed the case in chambers with the economist it had appointed and requested, at the conclusion of the trial, that he submit a memorandum analyzing the facts of record and suggesting remedies. As in *United Shoe,* the economist appointed in the present case resigned after submitting his memorandum. Finally, however, a disanalogy. Unlike the court in *United Shoe,* this court did not present a draft of its findings, conclusions and decree to the economist for comment.

### Conclusion

The authority of a court in general and a federal court in particular to appoint a technical advisor has been reviewed. This court has found that not only does statutory authority exist in both the United States and England, but that a long and enduring tradition on both sides of the Atlantic recognizes the inherent authority of a court to appoint advisors. The virtues and advantages of advisory assistance on technical matters for facilitating a just adjudication has been established by courts sitting in admiralty, equity and at law. The documented history of this practice dates from the early fourteenth century in Valencia and spans more than six centuries to include a federal court sitting within the First Circuit of our own judicial system. In the face of this statutory authority, history and decisional precedent, defendant now contests the validity of this procedure.

Defendant, however, can not prevail in this contest. One can no more alter the judgment of courts coeval with the common law, than one can dispute the contemporary enacted judgment of the United States Congress. Nor, on this issue, does the latter derogate from the former: both courts and Congress have countenanced the appointment of advisory experts and consultants to assist a court effect a just and intelligent adjudication. This court concurs in their collective judgment.

For the foregoing reasons, defendant's motion for a new trial or in the alternative to amend the court's findings, conclusions and judgment is DENIED.

So Ordered.